JOHN A. KINANE, PLAINTIFF-APPELLEE, v. JOSEPH S. FAY AND EDWARD SHINN, DEFENDANTS-APPELLANTS.

Argued May 2, 1933—Decided October 25, 1933.

Before Justices PARKER and PERSKIE.

For the defendants-appellants, *Kraemer, Siegler & Siegler*.

For the plaintiff-appellee, *Norbury C. Murray*.

The opinion of the court was delivered by

PERSKIE, J. This appeal brings up for review a judgment, based on a jury verdict, in favor of the plaintiff-appellee, hereinafter called plaintiff, and against the defendants-appellants, hereinafter called defendants, in the sum of $400.

The record submitted discloses the following facts: The plaintiff was a member of twenty-six years' standing in Local No. 825, of the International Union of Operating Engineers, which is a voluntary association with headquarters in the city of Newark, New Jersey, and holds a charter from the International Union of Operating Engineers, which is likewise a voluntary association having its headquarters in Washington, D. C. Both organizations are known as "trade or labor unions." Joseph S. Fay was the president and Edward Shinn the business agent of said local.

The defendants, Fay and Shinn, by reason of their positions aforesaid, with the assistance of others, were able to prevent any member of the local from obtaining or retaining employment at his trade anywhere in the northern part of the State of New Jersey by the use of the so-called "O. K. system." On April 19th, 1932, plaintiff was hired by Daniel J. Cronin, Incorporated, to commence work for it on April 22d, 1932, on a certain building in Newark, New Jersey, known as the "Newark city garage." On April 19th, 1932, the plaintiff was three months in arrears for dues. Article 16 of the constitution of the union provided as follows:

### "ARTICLE XVI.

### Membership dues.

"Section 1. Members shall pay their dues up to date, and any member in arrears for three months shall not be considered in good standing. If in arrears for more than three months he shall be deemed in bad standing; and shall stand

suspended from all privileges of membership; including attendance at meetings but not expelled, and the local shall pay per capita tax to the general secretary-treasurer on such member, until the local notifies the general secretary-treasurer of his suspension. In order to reinstate himself in the local that suspended him, he shall pay up all arrearages and one month's dues in advance. When a member becomes reinstated the local reinstating said member, must remit back per capita tax to the general secretary-treasurer from the date of his suspension. Members suspended for non-payment of dues may be reinstated within thirty days after their suspension, by paying their arrearages and three month's dues in advance; failing in this, they may only be admitted in the manner similar to new members, except members who are more than one year in arrears for dues, and who have been suspended, must pay a year's back dues to the suspending local and a new initiation fee to the local in which they desire to be initiated. The local which suspended them must remit twelve month's back per capita tax to the general secretary-treasurer when this has been complied with. Fines, assessments, &c., shall be charged as dues if not paid within thirty days after notification. A suspended member may, on motion, be expelled by a vote of the suspending local union, but he remains a member until expelled."

On April 22d, 1932, plaintiff tendered dues for the months of January, February, March, April and May, and assessments, totaling $38. The acceptance of this sum would have reinstated the plaintiff in good standing. This was refused until April 29th, 1932. The defendant Fay participated in this refusal. In the meantime, i. e., between April 19th, 1932, and April 29th, 1932, defendants, in conjunction with others, illegally and without lawful justification conspired to prevent and succeeded in preventing the plaintiff from working for Daniel J. Cronin, Incorporated, between the dates of April 22d, 1932, and April 29th, 1932, by stating that the plaintiff was unfair to union labor, and threatening Daniel J. Cronin, Incorporated, that if it permitted the plaintiff to work for it at said employment the defendants would, in conjunction with certain other officials of other labor unions cause all of the

other workmen who were members of various labor unions, to stop work and strike. In other words, they threatened a general strike. Daniel J. Cronin, Incorporated, yielded to the pressure. Nor was this all. The testimony tended to justify the conclusion that the plaintiff was regarded by the defendants as *persona non grata;* he acted "so stubborn:" he had the temerity to obtain work for six weeks and four days out of twenty months without defendants' "order," meaning their "O. K. and permission." But maliciously, to rid the plaintiff of his standing in the local, a charge of slander was preferred against him. The gravamen of the charge was that the plaintiff made the following statement at the time of the refusal to accept his dues: "For going to work after you people keeping me on the street for twenty months with the exception of six weeks and four days." Plaintiff was never tried. He employed counsel and obtained equitable relief, to wit, an injunction which restrained the trial. All this, plus a great deal of additional testimony, showed at the end of plaintiff's case substantially the following:

(a) That the defendant Fay was "displeased" with plaintiff because the latter attempted to obtain work without the permission of Fay; (b) that it was necessary for anyone seeking employment to obtain the permission of the defendants, Fay and Shinn; (c) that the officers of the local (assistant secretary) refused to accept plaintiff's arrearages in dues, and defendant Fay participated in this refusal; (d) that plaintiff secured employment without obtaining the permission of the defendants, Fay and Shinn; (e) that the defendants, Fay and Shinn, preferred false charges of slander against the plaintiff because that was the only way of "getting" plaintiff, they being unable to do anything regarding plaintiff's working without an "O. K.;" (f) that the local had a monopoly of hoisting engineers in Newark and vicinity; (g) that the defendant Shinn, together with the business agents of other local unions, visited plaintiff's employer and threatened to call a general strike if said employer did not discharge plaintiff because the latter was said to be a member in bad standing in the local.

This was, of course, contradicted by the defendants. A

jury question was thus presented. The jury allowed plaintiff for loss sustained from April 22d, 1932, to April 29th, 1932, and counsel fee, and punitive damages for the balance. Twenty-two specifications of error are assigned and grouped into five classes.

It will serve no useful purpose to discuss these assignments of error *seriatim*. Similar controversies have received our judicial consideration. In the case of *New Jersey Painting Co.* v. *Local No. 26, &c.,* 96 *N. J. Eq.* 632; 126 *Atl. Rep.* 399, Mr. Justice Black, speaking for the Court of Errors and Appeals, held:

"Since the passage of the statute in New Jersey, in 1883, the rule of the common law, that combinations of two or more persons, which were held to be illegal, has been greatly modified in this country, in its application to labor unions and labor disputes. The weight of authority by the more recent cases now seems to be that, an act lawful, if done by one, is not necessarily rendered unlawful by the mere fact of concerted action. To render such concerted act unlawful, the object or the means used must be unlawful or exercised for the malicious purpose of injuring another. Mere concert of action, in and of itself, not being sufficient to render the act illegal. *American Federation of Labor* v. *Bucks Stove, &c., Co.,* 33 *App. D. C.* 83; 32 *L. R. A.* (*N. S.*) 748; 221 *U. S.* 418; 16 *R. C. L.* 430, ¶¶ 13, 14; *Meier* v. *Spear,* 96 *Ark.* 618; 32 *L. R. A.* (*N. S.*) 792; 24 *Cyc.* 819."

In the case of *Bayer* v. *Brotherhood of Painters, &c.,* 108 *N. J. Eq.* 257 (at *p.* 260), the Court of Errors and Appeals in an opinion by Mr. Justices Donges, followed the case of *New Jersey Painting Co.* v. *Local No. 26, &c., supra,* and pointed out that there was "* * * no charge that defendants have resorted to violence or threatened violence. They have merely determined that complainant's conduct was such as to make it desirable for the union, as a group of employes, to decline to work for him, and, without threats or intimidations, have sought to enforce their demands. Nowhere is there evidence of any act not within the provisions of the statutes, as interpreted by this court."

In the case of *Walsche* v. *Sherlock,* 110 *N. J. Eq.* 223, be-

ginning at page 244, Vice-Chancellor Berry very exhaustively reviewed the cases and authorities on the question which arises in the instant case. On page 244 he held:

"Article 1, paragraph 1, of the constitution of this state provides that—

" 'All men are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.'

"Those unalienable rights being guaranteed by the constitution, any contract, unreasonably restrictive thereof, is necessarily void. I do not suggest that every contract restrictive of constitutional rights is void. Mutual advantages arising from such contracts equal to the burden assumed or privileges curtailed may justify an individual in waiving constitutional rights. But those rights which the constitution recognizes as unalienable will be preserved by the courts notwithstanding individual contracts of waiver especially. where the public interest is affected because that interest transcends the will or whim of the individual. This concern as to the public interest is what is known as "public policy." The contracts of individuals containing restrictions upon uanlienable rights which are of an oppressive nature, and operating generally in the community to prevent workmen from obtaining employment and from earning their livelihood will not, therefore, be countenanced."

"In *Brennan* v. *United Hatters of North America, &c.,* *supra* [73 *N. J. L.* 729], Mr. Justice Pitney, speaking for the Court of Errors and Appeals (at *p.* 742), said:

" 'The common law has long recognized, as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellow men, saving such as may result from the exercise of equal or superior rights on their part—such, for instance, as the right of fair competition in the like field of human effort—and saving, of course, such other hindrance or obstruction as may be legally excused or justified.'

"And after reciting the provisions of the first section of our constitution above quoted, he continued:

" 'Our Court of Chancery * * * has affirmed the right of the citizen to conduct his business free from malicious interference, including his right to have free opportunity to hire employes. *And we may remark that the right of one seeking employment to have free opportunity to gain employment, and to retain a position of employment once it is gained, is as precious in the eye of the law as the right of the employer.'* (Italics mine.)"

The court, in the case of *Brennan* v. *Hatters of America, supra,* further held (at *p.* 737):

"In our opinion, the gist of the action is the damage caused to the plaintiff by an unwarranted interference with him in his employment as a hatter. If the framer of the declaration, instead of including in that pleading averments respecting the proceedings of the vigilance committee and of the other defendants that eventuated in the withdrawal of the plaintiff's membership card, had contented himself with averring that defendants had unlawfully and without just cause or excuse procured plaintiff's discharge by his employer, it would, as we think, have set forth the material averment upon which his right of action depends. Defendants might then have pleaded that his discharge resulted solely from the withdrawal of his membership card, and that this resulted from his conviction of an offense against the rules of trade, after a fair trial had upon charges submitted by a member in writing, and on due notice to the plaintiff in accordance with the laws of the association of which he was a member. This course of pleading would have presented the so-called trial and conviction of the plaintiff in its true light, as an alleged justification or excuse for the action of the defendants in procuring his dismissal from employment."

Further continuing the court said (at *p.* 740):

"Had plaintiff's discharge from employment resulted from a due course of procedure had against him in the association, in accordance with the by-laws to which he had given his consent, and had such procedure been set up as a justification or excuse for those who procured his discharge, he might have

raised the question of the unlawfulness of the trade agreement with the manufacturing hatters in order to show that the alleged excuse or justification was not a lawful one.

"But since upon the record before us it must be held that plaintiff's suspension from the association and the consequent withdrawal of his membership card were not warranted by the laws of the association, because the tribunal that tried him acted without jurisdiction, it is unnecessary to pursue the inquiry whether the defendant association, by establishing a trade agreement that tended to promote a monopoly and to deprive workmen in the hatters' craft of a fair opportunity to obtain employment, had violated the law or the public policy of this state."

The court further held (at *pp.* 737, 740) that it was not necessary to decide whether the union had an unlawful monopoly on labor which was contrary to public policy; that if the plaintiff had participated in such unlawful monopoly by entering into an agreement with the union (in becoming a member thereof), yet he could repudiate such agreement and recover upon a ground of action existing independent of the agreement. And at page 745 of this case, the court further held:

" 'Now, intentionally to do that which is calculated in the ordinary course of events to damage, and which does in fact damage another in that other person's property or trade, is actionable if done without just cause or excuse. Such intentional action, when done without just cause or excuse, is what the law calls a malicious wrong.' This statement was cited with approval by Vice-Chancellor Green in *Barr* v. *Essex Trades Council,* 8 *Dick. Ch. Rep.* 101, 117. In our opinion this is a correct statement of the law and is as applicable to acts affecting a man's right to secure and retain employment as to his right to acquire and retain property or trade."

In the case of *Levin* v. *Cosgrove,* 75 *N. J. L.* 344 (at *p.* 347), the court held:

"Whatever right the brotherhood may have had to exert its discipline for the purpose of preventing its members from working with non-union men (nothing of the sort appears in those portions of the constitution that were introduced in

evidence), it had no right to prohibit the plaintiff, or any other non-union man, from working for any employer who sought his services. Plaintiff's right to seek and gain employment in his lawful occupation was a right secured to him by the constitution of this state. *Brennan* v. *United Halters,* 44 *Vr.* 729."

In the case of *Blanchard* v. *Newark Council,* 77 *N. J. L* 389, plaintiff was a member of a trade union, and was working for Hedden & Sons. Plaintiff was suspended as a member of the union and fined $100 by the district council, which plaintiff refused to pay on the ground that the fine was not imposed according to the laws of the union. The defendants, members of the local council, then notified plaintiff's employer that unless plaintiff was discharged, all the members of the local would be called off the job. In order to avoid the loss of such labor, Hedden & Sons discharged the plaintiff. Plaintiff paid the fine, appealed to a superior tribunal, and was allowed to resume work. On his appeal plaintiff was sustained, reinstated in the union, and the district council ordered to refund the fine which had been illegally imposed. The court held that the illegal imposition of the fine and deprivation of plaintiff's employment by act of the defendants created a right of action under *Brennan* v. *United Hatters, supra.* The fact that Hedden & Sons could have discharged plaintiff at any time because plaintiff had no contract with them does not answer the charge that defendants, by their unlawful threats, influenced Hedden & Sons to discharge plaintiff. The plaintiff did not, by taking an appeal to the superior tribunal in the proceedings regarding the fine, waive his right to damages resulting from the illegal acts of the defendants in procuring his discharge. *Affirmed,* 78 *Id.* 737.

It is elementary law that where a defendant has been guilty of a malicious wrong, punitive damages may be recovered. *Blackmore* v. *Ellis,* 70 *N. J. L.* 264; *Wendelken* v. *Stone,* 88 *Id.* 267. The court therefore properly charged in effect that if malice appeared punitive damages might be awarded.

On the subject of damages the trial judge charged the jury, *inter alia,* as follows:

"You have also a right to take into consideration, in arriv-

ing at damages, such sum as you may find that he reasonably expended in retaining counsel to advise him and to protect him from this unlawful and malicious interference with his work as he claimed."

Defendants contend that this charge is erroneous. We think that they are correct in their contention. The proof indicates that plaintiff paid his attorney a fee of $250 for his services. Assuming that the service rendered was in connection with matters, either pertaining to or arising out of the subject-matter of the instant suit and that the charge was a reasonable one, is the fee paid an admissible item of damages in a case of this nature? The authorities are not in accord. *Bauer on Damages* (1919), 192, says that:

"Some malicious torts have sometimes been treated as exceptions to the general rule that no compensation for counsel fees will be allowed; but no satisfactory statement of the principles governing this branch of the subject has ever been evolved by any court. In some jurisdictions, counsel fees may be recovered in cases in which exemplary damages are given; but such a rule seems to be founded more on sentiment than on principle."

In 17 *Corp. Jur.* 807, the text reads:

"Apart from the sums allowable and taxed as costs, there can, as a general rule, be no recovery as damages of the costs and expenses of litigation, or expenditures for counsel fees. In cases of civil injury or breach of contract, in which there is no fraud, willful negligence, or malice, the courts have considered that an award of the costs in the action is sufficient to cover the expenses of litigation and make no allowance for time, indirect loss, and annoyance."

"Where the facts are such that an award of exemplary damages may be made, the probable counsel fees may be considered by the jury in estimating the amount of such damages, but under this rule attorneys' fees are not allowed as compensation but rather as punishment for the defendant's wrongful and malicious act, and they are not allowed in addition to the sum assessed as exemplary damages. So in cases of wanton or malicious injury, or of gross negligence, or fraud, it has been held that there may be a recovery for the expenses

of litigation. However, according to other authorities there can, even in cases where punitory damages may be awarded, be no allowance for counsel fees, or expenses of litigation; and while the sum awarded may indirectly compensate plaintiff for such expenses, their amount cannot be taken as a measure or as a necessary element of damages.

"Where the natural and proximate consequence of a wrongful act has been to involve plaintiff in litigation with others, there may, as a general rule, be a recovery in damages against the author of such act of the reasonable expenses incurred in such litigation, together with compensation for attorneys' fees, and such costs as may have been awarded against plaintiff; but such expenses must be the natural and proximate consequence of the injury complained of, and must have been necessarily incurred. So in an action for the breach of a contract intended to obviate litigation, the expenses of litigation necessitated by reason of the breach may be recovered. Necessary expenses for counsel fees and litigation incident to an attempt to prevent or limit the damages occasioned by defendant's wrongful act are recoverable."

In 8 R. C. L. 499, ¶ 60, it is stated:

"As a general rule the costs and expenses of litigation, other than the usual court costs, are not recoverable in an action for damages; nor are they recoverable in any subsequent action. In some states, however, such costs and expenses, including attorney's fees, are regarded as proper elements of damages against a wrong-doer, and their recovery is sometimes authorized by statute. The general rule above stated is subject to another rule equally well settled, and that is to the effect that where the wrongful act of the defendant has involved the plaintiff in litigation with others, or placed him in such relation with others as makes it necessary to incur expenses to protect his interest, such costs and expenses should be treated as the legal consequence of the original wrongful act; and the rule, is of course, dependent upon whether the expenses are the natural and necessary consequences of the defendant's act, since in any event, remote, uncertain and contingent consequences do not afford a basis for a recovery. In some states expenses of litigation

are not recoverable unless the defendant has acted in bad faith or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense; while in other jurisdictions expenses of litigation are regarded as an element of exemplary damages and not of compensatory damages, and hence are recoverable only in those cases in which exemplary damages are awarded. It is clear that where the last stated rule prevails, the right to recover the costs and expenses of litigation may be denied, if, in the particular jurisdiction, exemplary damages are not recoverable. Instances occur where in actions of tort, involving malice, fraud, insult, or oppression, the jury may, in estimating compensatory damages, take into consideration the reasonable counsel fees of the plaintiff in prosecuting his action for redress of his injuries against the wrong-doer, and this even where there are mitigating circumstances not amounting to a justification."

In the recent case of *Textileather Corp.* v. *American Mutual Liability Insurance Co.* (*Court of Errors and Appeals*), 110 *N. J. L.* 483; 166 *All. Rep.* 214, Mr. Justice Case exhaustively reviewed this subject and reached the conclusion that a successful party to an action at law is not entitled to visit upon a defeated party the costs and expense, including counsel fees, except as the party is bound thereto by his contract or as the statutes of the state provide.

The rule of law established in the case of *Textileather Corp.* v. *American Mutual Liability Insurance Co., supra,* related to actions *ex contractu*. What should be the rule of law on this subject in actions *ex delicto?*

However contrary the law may be elsewhere, we feel that sound public policy constrains us to hold that the rule of law on this subject should be the same in actions of tort as it has already been declared to be in actions on contract.

Accordingly the judgment below is reversed to the end that there may be a new trial on the subject of damages only. Costs to be taxed on the final result.