924 P.2d 559

**Blossom Joshua KUNEWA,**
**Plaintiff–Appellee,**

and

**Gladys K. Brash, Lorraine K. Daniel**
**and Doris K. Farm, Plaintiffs,**

v.

**Isaac K. JOSHUA, Jr., aka Isaac Kahele**
**Joshua, Jr., Defendant–Appellant.**

**No. 16229.**

Intermediate Court of Appeals of Hawai'i.

Aug. 28, 1996.

Edward Y. N. Kim, Kim & Kim, on the briefs, Honolulu, for defendant-appellant.

Carroll S. Taylor (Taylor, Leong & Chee, of counsel), on the brief, Honolulu, for plaintiff-appellee.

Before BURNS, C.J., WATANABE and HEEN, JJ., RECUSED.*

WATANABE, Judge.

This lawsuit arises out of a dispute over whether Defendant–Appellant Isaac K. Joshua, Jr., also known as Isaac Kahele Joshua, Jr. (Defendant), exceeded his authority when he used a general power of attorney from his mother, Rose K. Joshua (Mother), to gift substantially all of Mother's property to himself, to the exclusion of his four sisters, Gladys K. Brash (Gladys), Lorraine K. Daniel (Lorraine), Doris K. Farm (Doris), and Plaintiff–Appellee Blossom Joshua Kunewa (Plaintiff) [1] (collectively, Sisters).

---

* On October 6, 1993, Circuit Judge Marie N. Milks was assigned to sit with the judges of the Hawai'i Intermediate Court of Appeals, temporarily, in place of then Associate Judge Walter M. Heen, who was recused from this case. Judge Heen subsequently retired on October 30, 1994.

1. This lawsuit was filed by Plaintiff–Appellee Blossom Joshua Kunewa (Plaintiff) against Defendant–Appellant Isaac K. Joshua, Jr., also known as Isaac Kahele Joshua, Jr., (Defendant) on March 16, 1988. On December 20, 1988, Gladys K. Brash (Gladys), Lorraine K. Daniel (Lorraine), and Doris K. Farm (Doris) moved to intervene in the lawsuit as plaintiffs, and their motion was granted on April 17, 1989. In the meantime, however, on December 29, 1988, Plaintiff filed a motion for partial summary judgment which was granted on July 14, 1989. Because the intervention was granted after Plaintiff's motion for partial summary judgment had been filed, a question arose as to whether the partial summary judgment could be entered in favor of Gladys, Lorraine, and Doris, in addition to Plaintiff. To obviate this question, Gladys, Lorraine, and Doris stipulated with Defendant that they would dismiss with prejudice the prosecution of their claims against Defendant, but that Plaintiff's claims for "payment of rents and proceeds," "fraud," and "willful, wanton and callous disregard of ... trust" would be tried. Gladys, Lorraine, and Doris also agreed to be

Defendant appeals from the First Circuit Court's: (1) July 14, 1989 order granting partial summary judgment in Plaintiff's favor, which concluded that Mother's power of attorney did not authorize Defendant to convey Mother's property to himself without consideration and which directed Defendant to hold all property so transferred as constructive trustee for the beneficiaries of Mother's estate (Partial Summary Judgment Order); (2) June 9, 1992 Amended Judgment based upon a special jury verdict, awarding Plaintiff $34,670.10 in special damages and $95,000 in punitive damages (Amended Judgment); and (3) April 26, 1991 Order Denying Defendant's Motion for Reconsideration of [the February 4, 1991 Order Denying] Defendant's Motions for (A) Judgment Notwithstanding the Verdict, (B) Reconsideration of Order Denying Motion for Directed Verdict and (C) New Trial (April 26, 1991 Order).

We (1) affirm the Partial Summary Judgment Order, (2) affirm that part of the Amended Judgment which awarded Plaintiff special damages, vacate that part of the Amended Judgment which awarded Plaintiff punitive damages, and remand for a new trial on the punitive damages issue, and (3) vacate the April 26, 1991 Order.

## BACKGROUND

Mother was the widow of Isaac Joshua, Sr. (Father), who died on January 9, 1963. On September 15, 1947, both Mother and Father executed wills, bequeathing their individual estates to the other, and in the event of the death of the survivor, then in equal shares to their five children—Plaintiff, Defendant, Gladys, Lorraine, and Doris.

In 1980, Mother was hospitalized for medical problems. After she was released from the hospital, Mother asked Defendant to take her to an attorney so that she could settle her property and business affairs. On June 26, 1980, Defendant took Mother to see attorney Matthew Pyun (Pyun), a friend of Defendant. At Mother's request, Pyun prepared a document, which Mother subsequently signed, giving Defendant a general power of attorney to manage Mother's affairs (June 26, 1980 power of attorney).

The June 26, 1980 power of attorney, which was recorded at the Hawai'i Bureau of Conveyances on June 27, 1980, read in relevant part, as follows:

ROSE KAPU JOSHUA of 2105 St. Louis Drive, City and County of Honolulu, State of Hawaii [Hawai'i],

have made, constituted and appointed and by these presents do make, constitute and appoint ISAAC KAHELE JOSHUA, JR., of 86–124 Hoaha Street, Waianae [Wai'anae], City and County of Honolulu, State of Hawaii [Hawai'i],

my true and lawful attorney, for me in my name, place and stead, and for my use and benefit with full power and authority to do and perform every act, deed or thing that I might or could do if personally present, including without limitation, the following:

\*   \*   \*   \*   \*   \*

2. To bargain, contract, purchase, receive and take real property and/or any interests therein and to accept the seizin and possession thereof and the delivery of all deeds, leases, assignments, agreements, options and other conveyance documents thereto, and to rent, lease, sublease, bargain, sell, release, convey, mortgage, hypothecate, and in every manner deal with the real property I now own, and any real property I may hereafter acquire, upon such terms and conditions, and under such covenants as he shall think fit;

3. To bargain and agree for, buy, sell, mortgage, hypothecate and in any and every way and manner deal in and with goods and merchandise, choses in action and other property in possession or in action;

\*   \*   \*   \*   \*   \*

6. To sign, seal, execute, acknowledge and deliver for me and in my name, and as my act and deed, such deeds, options, grants, leases, assignments, covenants, indentures, agreements, mortgages, hypothecations, bills, checks, bonds, notes, receipts, evidences of debts, and such other

bound by the judgment entered by the circuit court on the issues that were tried.

instruments in writing of whatever kind and nature as may be necessary or proper in the premises.

The foregoing power of attorney did not contain any language expressly permitting Defendant to make gifts of Mother's property.

Defendant did not use the June 26, 1980 power of attorney to transfer title to any of Mother's property until the summer of 1987. On June 20, 1987, Mother suffered a stroke and was hospitalized. Her treating physician, Dr. Bernard Fong (Dr. Fong), discussed with Defendant and Sisters the possibility of Mother not being able to live beyond the next four days. Dr. Fong also informed Defendant and Sisters that Mother, on the other hand, might have a prolonged recovery, in which case the cost of her care and treatment could consume all of her assets.

After the meeting with Dr. Fong, Defendant decided to use the June 26, 1980 power of attorney to transfer all of Mother's assets to himself. Because Defendant initially could not locate the June 26, 1980 power of attorney, he requested that attorney Blake Okimoto (Okimoto) prepare another power of attorney and have Mother execute it at the hospital.

Upon arrival at Mother's hospital room on June 22, 1987, Okimoto found that Mother "was bedridden and unable to communicate verbally[.]" To determine whether Mother were mentally competent to execute this second power of attorney, Okimoto explained the contents of the power of attorney document to Mother and informed her that if she signed the document, she would be giving Defendant the ability to act on her behalf as to all property that she owned. Okimoto asked Mother to squeeze his hand if she understood what he was explaining to her, and Mother responded by squeezing his hand. Okimoto also asked Mother if it was her desire to convey her property to Defendant, and Mother again squeezed Okimoto's hand.

Because of her physical condition, Mother was unable on her own to sign her name on the power of attorney document. Defendant, therefore, assisted Mother by guiding her hand to the signature line of the document and holding her hand steady as she made an "X" mark. Okimoto, who was also a notary public, then signed and sealed the notarial acknowledgment certificate on the document, thus certifying that Mother had appeared before him and had signed the document as her free act and deed. Okimoto also required Mother to sign her "X" in his notarial record book,[2] which contained documentation of all notarial acts performed by Okimoto. Okimoto then had both Defendant and Defendant's wife, Maile Joshua (Maile), sign the power of attorney document as witnesses. He also required Maile and the following individuals, who were present in the hospital room and had witnessed Mother's signing of the power of attorney document, to sign his record book as witnesses to the transaction: Doris, who would later be named as the personal representative of Mother's estate; Lorraine; and Faith Brash, Lorraine's daughter and Mother's granddaughter.

Following Mother's execution of the second power of attorney, Defendant located the original June 26, 1980 power of attorney at the Bureau of Conveyances. Before Mother died on September 9, 1987, Defendant used the original power of attorney to transfer to himself Mother's interest in a lien-free home on St. Louis Drive, some real property on the Big Island, and some real property in California. In addition, Defendant put his name on the titles to Mother's bank accounts and car. Defendant attempted, but was not allowed, to use the power of attorney to transfer Mother's common stock into his own name; however, he continued to use the power of attorney after Mother's death to negotiate Mother's stock dividend checks and to deposit the same into his bank account. Defendant never paid Mother for any of the property so transferred.

After Defendant made the foregoing transfers of title to Mother's property to himself, he informed Sisters of the transfers. He also assured them that they should not worry because "[i]t will all be equal.... When

2. Hawai'i Revised Statutes (HRS) § 456–15 (1993) requires, in part, that "[e]very notary public shall record at length in a book of records all acts, protests, depositions, and other things, by the notary noted or done in the notary's official capacity."

[M]other gets well, I will give everything back to [Mother]."

After Mother's death, however, Defendant changed his mind. At a family gathering in October 1987, Defendant showed Sisters a copy of Mother's will, the original of which was never found, and the original power of attorney which Mother had given him. Defendant then informed Sisters that Mother had expressed to him many times over the years of her intent to give him all of her property and that Mother had given him the power of attorney for that purpose. Defendant indicated that, in view of Mother's wishes, he considered all of the property he had transferred to himself pursuant to the power of attorney to be his alone. He also refused to commence a probate of Mother's will or to share Mother's property with Sisters in accordance with Mother's will or the statutes on intestacy.[3]

## PROCEDURAL HISTORY

On March 16, 1988, Plaintiff filed this lawsuit, alleging fraud and breach of trust by Defendant and seeking to (1) impose a constructive trust on the property transferred by Defendant to himself, (2) return the transferred property to Mother's estate, (3) submit Mother's will to probate, (4) collect fair market rent from Defendant for his occupancy of Mother's house after the transfer, and (5) award Plaintiff punitive damages, attorney fees, and costs for Defendant's conversion of Mother's property.

On December 29, 1988, Plaintiff filed a motion for partial summary judgment on two issues: (1) whether Mother's will should be submitted to probate; and (2) whether Defendant should be required to "convey to the personal representative of [Mother's estate] all property, real and personal, formerly owned by [Mother], title to which was conveyed into Defendant's name by Defendant acting under a power of attorney given him by [Mother], together with any dividends, interest, rents, issues and profits received by Defendant from or on account of said property." In opposing the motion, Defendant pro-

vided three affidavits[4] in support of his assertion that Mother had made several oral representations that she intended for Defendant to have all of her property.

On July 14, 1989, the circuit court entered an order granting Plaintiff's motion for partial summary judgment. In relevant part, the order read as follows:

THE COURT HEREBY FINDS: that the power of attorney given by [Mother] to Defendant dated June 26, 1980 is clear and unambiguous; and that said power of attorney does not contain any authority for Defendant to transfer [Mother's] property to himself, thereby effecting a gift to himself of her assets;

AND THE COURT THEREFORE CONCLUDES: that the June 26, 1980 power of attorney given by [Mother] must be strictly construed; that a strict reading of said power of attorney shows that Defendant was not empowered to deed over [Mother's] property to himself and thereby effect a gift to himself of [Mother's] assets; that the affidavits submitted by Defendant which tend to show [Mother] wanted Defendant to obtain the property through the power of attorney are insignificant in the light of the unambiguous power of attorney strictly construed; that the affidavits submitted by Defendant are inadmissible as parol evidence and are deemed not admissible for the Court; that Defendant holds all property formerly belonging to [Mother] which he acquired by the use of the June 26, 1980 power of attorney and said property shall be held as a constructive trust for the benefit of those people who will take through the probate of [Mother's] estate[.]

Based on the foregoing findings and conclusions, the circuit court ordered Defendant to deliver Mother's will to Plaintiff, to hold all of Mother's property in constructive trust, and to not transfer or encumber the real and personal property he had transferred to himself.

On December 19, 1990, the case proceeded to trial on the issue of damages. On January

---

3. Under the will of Rose K. Joshua (Mother), all of Mother's property was to be divided equally among her five children. The same division of property would result if Mother had died intestate. HRS § 560:2–103(1) (1993).

4. The affiants who signed the affidavits were as follows: Defendant; Defendant's wife, Maile Joshua; and Rose Kajioka Brash, Mother's niece.

3, 1991, the jury returned a special verdict, awarding Plaintiff special damages in the amount of "$45,671.00 less documented funeral expenses" and punitive damages in the amount of $95,000. The circuit court entered judgment for the foregoing amounts on February 4, 1991, and Defendant appealed from this judgment. However, on May 2, 1991, Defendant's appeal was dismissed by the Hawai'i Supreme Court because "the judgment did not fully determine the amount of special damages, is therefore incomplete and not final, and we do not have jurisdiction." Thereafter, on June 9, 1992, the circuit court entered an amended judgment which determined that the amount of special damages awardable to Plaintiff, after deducting documented funeral expenses of $11,000.90, was $34,670.10. This appeal followed.

Defendant argues that the circuit court committed reversible error in several respects. First, Defendant argues that the court was wrong when it granted Plaintiff's motion for partial summary judgment because a genuine triable issue of material fact existed as to Mother's intent in giving Defendant the power of attorney. Second, the court improperly instructed the jury that Plaintiff's attorney fees in bringing this lawsuit could be considered in computing the amount of a punitive damages award. Third, the circuit court erroneously admitted evidence of Defendant's refusal to comply with a prior court order to return Mother's assets to the administrator of Mother's estate. Fourth, the circuit court improperly allowed several of Plaintiff's witnesses to testify, since insufficient notice was provided to Defendant that the witnesses would be testifying. Finally, Defendant argues that the circuit court erred when it refused to allow Defendant to read into evidence a part of Plaintiff's deposition which was relevant to attack Plaintiff's credibility.

## DISCUSSION

### I. *The Partial Summary Judgment: Whether Defendant Exceeded His Authority Under the Power of Attorney*

#### A. *Standard of Review*

■ On appeal, an order granting summary judgment is reviewed under the same standard applied by the trial courts. *State v. Tradewinds Elec. Serv. & Contracting Inc.,* 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawai'i Rules of Civil Procedure Rule 56(c).

■ Where the construction of a written instrument is at issue in a lawsuit, the preliminary question of whether the instrument is ambiguous is a question of law that may be resolved on summary judgment. *Pelosi v. Wailea Ranch Estates,* 10 Haw.App. 424, 436, 876 P.2d 1320, 1327, *cert. denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994). Moreover, if the language of the instrument is clear and the meaning of the instrument can be readily ascertained from the words used therein, the legal effect and construction of the instrument are questions of law properly resolved on summary judgment disposition. *Id.*

Defendant contends that the circuit court erred in concluding, as a matter of law, that the power of attorney did not authorize him to convey Mother's property to himself without consideration. Defendant claims that because he submitted three affidavits which explained that Mother had intended that he use the power of attorney to make gifts to himself, a genuine issue of material fact existed as to the scope of his authority under the power of attorney, thus precluding summary judgment. We disagree.

### B. *Rules Governing Construction of Powers of Attorney*

"Powers of attorney are to be construed in accordance with the rules for interpretation of written instruments generally; in accordance with the principles governing the law of agency; and, in the absence of proof to the contrary, in accordance with the prevailing laws relating to the act authorized." 3 Am. Jur.2d *Agency* § 30, at 533–34 (1986).

■ The fundamental rule in construing written instruments is that the intent of the parties, as gleaned from the entire context of the instrument, governs. *Pelosi*, 10 Haw. App. at 436, 876 P.2d at 1327. "As long as the terms of [the instrument] are not ambiguous, i.e., not 'capable of being reasonably understood in more ways than one,' we are required to interpret the terms 'according to their plain, ordinary, and accepted sense in common speech.' " *Id.* (quoting *Cho Mark Oriental Food, Ltd. v. K & K Int'l*, 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992)).

It is also well-established that powers of attorney "are subjected to a strict construction and are never interpreted to authorize acts not obviously within the scope of the particular matter to which they refer." *Lopez v. Soy Young*, 9 Haw. 113, 115 (1892). As explained in *F.M. Stigler, Inc. v. H.N.C. Realty*, 595 S.W.2d 158, 161 (Tex.Civ.App.), *rev'd on other grounds*, 609 S.W.2d 754 (Tex. 1980),

> when authority is conferred upon an agent by a formal, written instrument, such as a power of attorney, the authority given the agent will be strictly construed so as to *exclude any authority not specifically set forth*, except authority necessary to effectuate the purpose of the authority granted.

(Emphasis added.)

■ Accordingly, it is well-settled that an agent lacks authority to make a gift of the principal's property unless that authority is expressly given by the language of the power of attorney. *Kaname Fujino v. Clark*, 71 F.Supp. 1, 4 (D.Haw.1947) (to authorize gift of asset by agent, the agent must have such a power expressly and clearly conferred; even if principal intended to make a gift to agent, if power of attorney lacked express language authorizing gift, no gift could be made), *aff'd*, 172 F.2d 384 (9th Cir.), *cert. denied*, 337 U.S. 937, 69 S.Ct. 1512, 93 L.Ed. 1743, *reh'g denied*, 338 U.S. 839, 70 S.Ct. 34, 94 L.Ed. 513 (1949); *Aiello v. Clark*, 680 P.2d 1162, 1166 (Alaska 1984) (in absence of express authority to make a gift, none may be made); *Johnson v. Fraccacreta*, 348 So.2d 570, 572 (Fla. App.1977) (agent has no power to make a gift of his principal's property unless that power is expressly conferred upon the agent by the

instrument or unless such power arises as a necessary implication from the powers which are expressly conferred).

■ Moreover, courts have routinely held that in the absence of express written authorization, an agent may not gratuitously convey the principal's property to *himself. See, e.g., Hodges v. Surratt*, 366 So.2d 768 (Fla. App.1978) (agent exceeded authority in appropriating for agent's own use funds in decedent principal's checking account in the absence of clear language to that effect in the power of attorney), *cert. denied*, 376 So.2d 76 (Fla.1979); *In re Estate of DeBelardino*, 77 Misc.2d 253, 352 N.Y.S.2d 858, 863 (Sur.Ct. 1974) (power of attorney, no matter how broadly drawn, cannot be held to encompass an authorization to attorney-in-fact to make gift to himself of principal's property; such a gift carries with it a presumption of impropriety and self-dealing, a presumption which can be overcome only with the clearest showing of principal's intent to make the gift), *aff'd*, 47 A.D.2d 589, 363 N.Y.S.2d 974 (1975).

■ Where a power of attorney does not expressly authorize the attorney-in-fact to make gifts to himself or herself, extrinsic evidence of the principal's intent to allow such gifts is not admissible. An attorney-in-fact may not make a gift to himself or herself unless there is clear intent in writing from the principal allowing the gift. Oral authorization is not acceptable. *McCarter v. Willis*, 299 S.C. 198, 383 S.E.2d 252, 253 (App.1989).

The Fourth Circuit Court of Appeals has explained the policy reasons underlying the rule prohibiting extrinsic evidence as follows:

> When one considers the manifold opportunities and temptations for self-dealing that are opened up for persons holding general powers of attorney—of which outright transfers for less than value to the attorney-in-fact [himself or] herself are the most obvious—the justification for such a flat rule is apparent. And its justification is made even more apparent when one considers the ease with which such a rule can be accommodated by principals and their draftsmen.

*Estate of Casey v. Comm'r of Internal Revenue*, 948 F.2d 895, 898 (4th Cir.1991).

We now examine the power of attorney at issue in this lawsuit according to the foregoing rules.

### C.  *The Power of Attorney in this Case*

■  In the instant case, the power of attorney which Mother gave to Defendant did not expressly authorize Defendant to make gifts of Mother's property.  However, it did broadly authorize Defendant to "perform every act, deed or thing that [Mother] might or could do if personally present" and to "bargain, contract, purchase, receive and take real property and/or any interests therein and to accept the seizin and possession thereof and the delivery of all deeds, leases, assignments, agreements, options and other conveyance documents . . . and to rent, lease, sublease, bargain, sell, release, convey, mortgage, hypothecate, *and in every manner deal with the real property I now own, and any real property I may hereafter acquire, upon such terms and conditions . . . as he shall think fit.*"  (Emphasis added.)

Defendant contends that since the power of attorney which Mother conferred on him was so broad, its language is ambiguous as to whether it authorized him to make gifts of Mother's property to himself.  Therefore, the circuit court should have considered extrinsic evidence of Mother's intent in giving him the power of attorney and denied Plaintiff's motion for partial summary judgment.  We disagree.

"Well established rules of interpretation of powers of attorney dictate that broad, all-encompassing grants of power to the agent must be discounted."  *Mercantile Trust Co. v. Harper,* 622 S.W.2d 345, 349 (Mo.App. 1981) (citing *Restatement (Second) of Agency* § 34, comment h (1958)).  *See also Estate of Casey v. Comm'r of Internal Revenue,* 948 F.2d at 900–01 (where power of attorney expressly authorized agent to transfer principal's assets by sale, lease, or mortgage, but omitted any reference to the power of transfer by gift, the expansive language of the power of attorney would be interpreted to confer only those incidental, interstitial powers necessary to accomplish objects as to which authority has been conferred and not to confer power to make a gift).

Three reasons are mentioned for the application of the foregoing doctrine:

First, the power to make a gift of the principal's property is a power that is potentially hazardous to the principal's interests.  Consequently, this power will not be lightly inferred from broad, all-encompassing grants of power to the agent.  Accordingly, the agent must be circumspect with regard to the powers created—or the lack of them.

Second, the main duty of an agent is loyalty to the interest of his principal. . . . Thus, in exercising granted powers under a power of attorney, the attorney in fact is bound to act for the benefit of his principal and must avoid where possible that which is detrimental unless expressly authorized. . . .

Third, it would be most unusual for an owner of property to grant a power of attorney authorizing the attorney in fact to give his property away.  If a person has decided to make a gift of property, he or she usually decides as to who is going to be the donee.

*King v. Bankerd,* 303 Md. 98, 492 A.2d 608, 613 (1985) (citations, quotation marks, and brackets omitted).

In *Kaaukai v. Anahu,* 30 Haw. 226 (1927), the Hawai'i Supreme Court held that a power of attorney broadly authorizing an agent to "grant, bargain and sell" on behalf of the principal "any land in the Territory of Hawaii [Hawai'i] belonging to [him or] her or in which [he or] she might have an interest" did not confer authority on the agent to give the land away.  *Id.*

In the present case, we similarly conclude that the clear and unambiguous language of the general power of attorney given by Mother to Defendant did not authorize Defendant to make a gift to himself of Mother's property.  Therefore, the circuit court correctly ruled as a matter of law that Defendant lacked authority to make a gift of Mother's property to himself and properly granted Plaintiff's motion for partial summary judgment.

## II. *The Punitive Damages Award*

In its charge to the jury, the circuit court gave the following instruction regarding how punitive damages should be calculated:

> If you allow punitive damages in this case then in assessing such damage you may take into consideration the following items: (1) such amount as will deter defendant from such future conduct; (2) an amount as shall be an example to others and deter them from such conduct; (3) *[t]he probable and reasonable expense of the litigation including attorney's fees, expert witness fees and the inconvenience and time involved in preparing for trial* [.] The amount should not be so small as to be trifling nor so large as to be unjust, but such as candid and dispassionate minds can approve as a punitive example and as a warning to others against a similar lapse of duty.

(Emphasis added.)

■■■ Defendant contends that the circuit court committed reversible error when it instructed the jury that attorney fees are an element of punitive damages. Defendant points out that the "longstanding rule of Hawai'i law" is that "no attorney fees may be awarded as damages or costs unless so provided by statute, stipulation or agreement" and no statute, stipulation, or agreement authorized the imposition of attorney fees in this case. Therefore, Defendant contends, the court's instruction provided an indirect means for Plaintiff to obtain compensation for attorney fees where none was allowed by law.

We find no error in the circuit court's instruction.

### A. *The Law of Punitive Damages in Hawai'i*

■■■ The purpose of a punitive damages award in Hawai'i is not to compensate the plaintiff, but rather, to punish the defendant "for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future." *Masaki v. General Motors Corp.*, 71 Haw. 1, 6, 780 P.2d 566, 570, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1989). In order to recover punitive damages, the plaintiff "must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Id.* at 16–17, 780 P.2d at 575.

The Hawai'i Supreme Court has instructed that "the proper measurement of punitive damages should be '[t]he degree of malice, oppression, or gross negligence which forms the basis for the award and the amount of money required to punish the defendant....'" *Kang v. Harrington*, 59 Haw. 652, 663, 587 P.2d 285, 291 (1978) (quoting *Howell v. Associated Hotels*, 40 Haw. 492, 501 (1954)). However, no Hawai'i case has specifically addressed the question of whether a plaintiff's attorney fees may be considered in determining the *amount* of punitive damages.[5]

### B. *Attorney Fees as an Element of Punitive Damages in Other Jurisdictions*

Courts in other jurisdictions disagree on whether a jury, or a judge sitting as fact finder, may consider a plaintiff's attorney fees or other litigation costs in determining an award of punitive damages. *See* Annotation, *Attorneys' Fees or Other Expenses of Litigation as Element in Measuring Exemplary or Punitive Damages*, 30 A.L.R.3d 1443 (1970).

Several jurisdictions refuse to allow a jury to consider reasonable attorney fees in measuring an award of punitive damages, reasoning that (1) such fees are compensatory in

---

5. In *Masaki v. General Motors Corp.*, 71 Haw. 1, 780 P.2d 566, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1989), the Hawai'i Supreme Court observed in dicta that "[o]ther purposes for imposing punitive damages which have been recognized by courts and commentators include preserving the peace; inducing private law enforcement; compensating victims for otherwise uncompensable losses; and *paying the plaintiff's attorneys' fees.*" 71 Haw. at 8 n. 2, 780 P.2d at 571 n. 2 (emphasis added; citation omitted).

nature and therefore not a proper consideration in measuring a punitive damages award, or (2) the jury ought to have unfettered discretion in deciding the amount of punitive damages subject only to a trial court's remittitur if it deems the award excessive. *See, e.g., Viner v. Untrecht,* 26 Cal.2d 261, 158 P.2d 3 (1945); *Kinane v. Fay,* 111 N.J.L. 553, 168 A. 724 (1933); *International Elecs. Co. v. N.S.T. Metal Prods. Co.,* 370 Pa. 213, 88 A.2d 40 (1952); *Earl v. Tupper,* 45 Vt. 275 (1873); *Fairbanks v. Witter,* 18 Wis. 287 (1864).

The majority of jurisdictions, however, regularly allow a jury to consider attorney fees in computing the amount of punitive damages. *See e.g., Afro–American Publishing Co. v. Jaffe,* 366 F.2d 649 (D.C.Cir.1966); *Marshall v. Betner,* 17 Ala. 832 (1850); *Markey v. Santangelo,* 195 Conn. 76, 485 A.2d 1305 (1985); *Umphrey v. Sprinkel,* 106 Idaho 700, 682 P.2d 1247 (1983); *Anvil Inv. Ltd. Partnership v. Thornhill Condominiums, Ltd.,* 85 Ill.App.3d 1108, 41 Ill.Dec. 147, 407 N.E.2d 645 (1980); *Dorris v. Miller,* 105 Iowa 564, 75 N.W. 482 (1898); *Newton v. Hornblower,* 224 Kan. 506, 582 P.2d 1136 (1978); *St. Luke Evangelical Lutheran Church, Inc. v. Smith,* 318 Md. 337, 568 A.2d 35 (1990); *Oppenhuizen v. Wennersten,* 2 Mich.App. 288, 139 N.W.2d 765 (1966); *Central Bank of Mississippi v. Butler,* 517 So.2d 507 (Miss.1987); *Senn v. Manchester Bank of St. Louis,* 583 S.W.2d 119 (Mo.1979); *Jeffries Avlon, Inc. v. Gallagher,* 149 Misc.2d 552, 567 N.Y.S.2d 339 (N.Y.1991); *Fremont Oil Co. v. Marathon Oil Co.,* 26 O.O.2d 109, 192 N.E.2d 123 (Ohio Com.Pl.1963); *Hofer v. Lavender,* 679 S.W.2d 470 (Tex.1984); *Debry & Hilton Travel Servs., Inc. v. Capitol Int'l Airways, Inc.,* 583 P.2d 1181 (Utah 1978); *Kemp v. Miller,* 166 Va. 661, 186 S.E. 99 (1936); *Olds v. Hosford,* 354 P.2d 947 (Wyo. 1960), *reh'g denied,* 359 P.2d 406 (Wyo.1961).

Under the majority approach, " 'attorney fees are not allowed as compensation [to the plaintiff] but rather as punishment for defendant's wrongful and malicious act. They are not allowed in addition to the sum assessed as [punitive] damages, and their recovery is never permitted in a separate action....' " *Brewer v. Home–Stake Production Co.,* 434

P.2d at 830 (quoting 25 C.J.S. *Damages* § 50 (1966)).

Courts that have adopted the majority view generally reason that allowing a jury to consider the amount of a plaintiff's attorney fees in calculating punitive damages diminishes the potential for arbitrary and abusive punitive damages awards. In *St. Luke Evangelical Lutheran Church, Inc. v. Smith,* 568 A.2d 35, for example, the Maryland Court of Appeals held that allowing a jury to consider reasonable attorney fees in determining punitive damages satisfies two seemingly disparate goals:

> First, because the jury will be offered objective guidance in calculating the amount of its punitive award, punitive damages will be more accurately measured and the potential for abuse decreased. Second, the plaintiff can be made truly whole in precisely those kinds of cases in which the defendant's wrongful conduct is found to be at its most flagrant, for only in such cases are punitive damages warranted.

568 A.2d at 43 (citations omitted).

The majority view is consistent with the approach advocated by the *Restatement (Second) of Torts* (1958). The *Restatement* recognizes that "damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of the litigation." *Id.* § 914(1), at 492. However, the *Restatement* also states that "[i]n awarding punitive damages when they are otherwise allowable, the trier of fact may consider the actual or probable expense incurred by the plaintiff in bringing the action." *Id.,* comment a, at 493. *See also Restatement (Second) of Torts* § 908, comment e, at 467 (in determining the amount of punitive damages, the trier of fact can consider the extent of harm to the injured person, including "the fact that the plaintiff has been put to trouble and expense in the protection of his interests, as by legal proceedings in this or in other suits").

## C. Attorney Fees as an Element of Punitive Damages in Hawai'i

In *Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 278, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989), the United States Supreme Court

held that "the propriety of an award of punitive damages for the conduct in question, and *the factors the jury may consider in determining their amount, are questions of state law.*" (Emphasis added.) The Court thus left the responsibility for framing guidelines for punitive damages awards to the states. In a cogent concurring opinion, however, Justice Brennan lamented the general lack of guidance given to juries faced with the responsibility of calculating a punitive damages award:

> Without statutory (or at least common-law) standards for the determination of how large an award of punitive damages is appropriate in a given case, juries are left largely to themselves in making this important, and potentially devastating, decision. Indeed, the jury [in *Browning–Ferris* ] was sent to the jury room with nothing more than the following terse instruction: 'In determining the amount of punitive damages, … you may take into account the character of the defendants, their financial standing, and the nature of their acts.' [Citation omitted.] Guidance like this is scarcely better than no guidance at all. I do not suggest that the instruction itself was in error; indeed, it appears to have been a correct statement of [state] law. The point is, rather, that the instruction reveals a deeper flaw: the fact that punitive damages are imposed by juries guided by little more than the admonition to do what they think is best.

492 U.S. at 281, 109 S.Ct. at 2923 (Brennan, J., concurring).

Subsequently, in *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Court was called upon to determine whether a due process violation had occurred when an Alabama jury awarded over $800,000 in punitive damages against an insurer whose agent had defrauded an insured. The award was more than four times the amount of the compensatory damages award, more than two hundred times the out-of-pocket expenses incurred by the insured, and greatly in excess of the fine that could be imposed for insurance fraud under Alabama law.

The Court's majority initially conceded "that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 18, 111 S.Ct. at 1043. However, the Court ultimately upheld the award, concluding that the award had been made pursuant to objective criteria and had also been subjected to a full panoply of procedural protections. First, the trial court's instructions had placed reasonable constraints on the exercise of the jury's discretion by expressly describing the retribution and deterrence purposes of punitive damages, requiring the jury to consider the character and degree of the particular wrong, and explaining that the imposition of punitive damages was not compulsory. Second, the trial court had conducted a post-trial hearing to scrutinize the punitive damages award. Finally, the award had been subject to meaningful judicial review because the Alabama Supreme Court had approved the verdict, on appeal, after reviewing the propriety of the award according to the following factors:

> (a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) *all the costs of litigation;* (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

*Id.* at 21–2, 111 S.Ct. at 1045 (emphasis added).

The Court held that the application of the foregoing standards "impose[d] a sufficiently definite and meaningful constraint on the

discretion of Alabama fact finders in awarding punitive damages[,]" and "ensure[d] that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Id.* at 22, 111 S.Ct. at 1045. The award of punitive damages, therefore, "did not lack objective criteria" and did not "cross the line into the area of constitutional impropriety." *Id.* at 23–4, 111 S.Ct. at 1046. Compare *BMW of North America, Inc. v. Gore,* — U.S. —, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), where the Court struck down a $2 million punitive damages award against BMW of North America, Inc. (BMW) for having knowingly failed to tell a BMW automobile buyer that, at a cost of $600, it had repainted portions of his new $40,000 car, thereby lowering its potential resale value by approximately ten percent. The Court held the award grossly excessive in light of the following: (1) the low level of BMW's reprehensible conduct, (2) the 500 to 1 ratio between the punitive and compensatory damages awards, and (3) the difference between the punitive damages award and the civil or criminal sanctions that could be imposed for comparable conduct.

If a reviewing court may consider a plaintiff's litigation expenses in evaluating the propriety of a punitive damages award, we see no reason to preclude a jury from considering such expenses in calculating the award. Indeed, Justice O'Connor suggested as much in her dissent in *Haslip,* in which she strongly criticized the vagueness of the instructions concerning punitive damages provided to the jury and strongly urged that the same factors which the Court held that appellate courts could consider in reviewing punitive damages awards "could assist *juries* to make fair, rational decisions." 499 U.S. at 52, 111 S.Ct. at 1061 (O'Connor, J., dissenting) (emphasis added). As Justice O'Connor pointed out:

> Punitive damages are a powerful weapon. Imposed wisely and with restraint, they have the potential to advance legitimate state interests. Imposed indiscriminately, however, they have a devastating potential for harm. Regrettably, common-law procedures for awarding punitive damages fall into the latter category. States routinely authorize civil juries to impose punitive damages without providing them any meaningful instructions on how to do so. Rarely is a jury told anything more specific than "do what you think best."
>
> In my view, such instructions are so fraught with uncertainty that they defy rational implementation. Instead, they encourage inconsistent and unpredictable results by inviting juries to rely on private beliefs and personal predelictions. Juries are permitted to target unpopular defendants, penalize unorthodox or controversial views, and redistribute wealth. Multimillion dollar losses are inflicted on a whim. While I do not question the general legitimacy of punitive damages, I see a strong need to provide juries with standards to constrain their discretion so that they may exercise their power wisely, not capriciously or maliciously. The Constitution requires as much.

Id. at 42–3, 111 S.Ct. at 1056 (O'Connor, J., dissenting).

More recently, in *Honda Motor Co. v. Oberg,* 512 U.S. —, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), the Court struck down a $5 million punitive damages award by an Oregon jury which was over five times the amount of the plaintiff's compensatory damages award. The Court held that because the Oregon Constitution prohibited judicial review of the amount of punitive damages awarded by a jury, "unless the court can affirmatively say there is no evidence to support the verdict," the Oregon procedure for awarding punitive damages violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* at —, 114 S.Ct. at 2332. Dissenting, Justice Ginsburg noted that although Oregon did not provide for a post-verdict review and remittitur of the amount of a punitive damages award, it provided several pre-verdict mechanisms which channeled the jury's discretion more tightly than in *Haslip.* Significantly, the jury was instructed that the defendant could not be found liable for punitive damages unless the defendant's liability were established by "clear and convincing evi-

dence."[6] More importantly, jurors were given precise instructions detailing seven substantive criteria which they could consider in making their award, far more guidance than their counterparts in *Haslip* received. These criteria resembled the seven factors against which the Alabama Supreme Court reviewed the punitive damages award in *Haslip*. Justice Ginsburg argued that

> requir[ing] the factfinder to apply ... objective criteria [when calculating punitive damages is] more likely to prompt rational and fair punitive damage decisions than are the *post hoc* checks [by appellate courts] employed in jurisdictions following Alabama's pattern.

*Id.* at ——, 114 S.Ct. at 2347 (Ginsburg, J., dissenting). Justice Ginsburg also remarked that " 'application of objective criteria ensures that sufficiently definite and meaningful constraints are imposed on the finder of fact.' " *Id.* (quoting *Oberg v. Honda Motor Co.*, 316 Or. 263, 283, 851 P.2d 1084, 1096 (1993)).

We agree with Justices Brennan, O'Connor, and Ginsburg that meaningful standards are needed to guide a jury in its award of punitive damages. Accordingly, we adopt the majority view that a jury should be allowed to consider a plaintiff's attorney fees in determining the amount of a punitive damages award. We also conclude that, in the instant case, the circuit court's instruction to the jury to this effect was proper.

### III. *The Circuit Court's Evidentiary Rulings*

### A. *Evidence of Defendant's Refusal to Comply with Circuit Court's Order*

■ At trial, the jury was repeatedly allowed to hear evidence about Defendant's refusal to comply with the circuit court's Partial Summary Judgment order directing Defendant to return to the administrator of Mother's estate the assets he had wrongfully conveyed to himself. In explaining the relevance of such evidence, Plaintiff's counsel stated it was necessary for the jury to understand that its task was not to determine whether Defendant should return property to Mother's estate, but to assess the damages caused by Defendant's breach of duty. Plaintiff's counsel also explained that this evidence was relevant to establishing that Defendant's behavior was willful:

> The gist of my question, Your Honor, is the mental intent which I have to establish for punitive damages. My analysis of the case is that the question of intent breaks down into two parts post Judge Klein's order which is a separate element of punitive damages. This disobedience of the court's order and pre Judge Klein's order when he—what is his intent in breaching his fiduciary duties as an attorney in fact. So what I am getting at right now is his disregard, callous, wanton, and wilful disregard of Judge Klein's order and it goes into the punitive damages on the post Judge Klein issue.

Defendant contends that evidence of his refusal to comply with the Partial Summary Judgment Order should have been excluded at trial. Based on *Kang v. Harrington*, 59 Haw. 652, 587 P.2d 285, we agree.

In *Kang, supra,* the Hawai'i Supreme Court ruled that a non-jury award of $20,000 in punitive damages was excessive because it appeared that the trial court, in making its determination, improperly considered a defendant's subsequent actions in attempting to perpetrate a fraud on the court, as well as on the plaintiff. 59 Haw. at 660, 587 P.2d at 291. In reducing the punitive damages award, the supreme court held as follows:

> "The proper measurement of punitive damages should be '[t]he degree of malice, oppression, or gross negligence which forms the basis for the award and the amount of the money required to punish the defendant....' *Howell v. Associated Hotels*, [40 Haw. 492, 501 (1954) ]. Further, in determining that degree, the anal-

---

6. United States Supreme Court Justice Ginsburg noted that in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 6 n. 1, 111 S.Ct. 1032, 1037 n. 1, 113 L.Ed.2d 1 (1991), the "jury was told it could award punitive damages if 'reasonably satisfied from the evidence' that the defendant committed fraud." *Honda Motor Co. v. Oberg*, 512 U.S. ——, —— n .4, 114 S.Ct. 2331, 2334 n .4, 129 L.Ed.2d 336 (1994).

78

ysis is limited to an examination of defendant's state of mind at the time of the act. *O'Harra v. Pundt*, 210 Or. 533, 310 P.2d 1110 (1957). Consequently, defendant's subsequent actions and state of mind during trial are irrelevant."

*Id.* at 663, 587 P.2d at 293. The supreme court also explained that

> [t]he distinction between appellant's fraud on the court and his fraud on appellee is crucial since a finding of fraud on the court is unrelated to the fraud on appellee and will not provide a basis for an award of punitive damages. In assessing punitive damages the trial court should have ignored appellant's fraud upon the court and looked only to his fraud on appellee.

*Id.* at 660, 587 P.2d at 291.

In this case, Defendant's conduct in violating the circuit court's Partial Summary Judgment Order is similarly distinguishable from Defendant's fraud upon Sisters and cannot form a basis for an award of punitive damages. While Defendant's conduct may appropriately subject Defendant to contempt of court sanctions, such evidence is irrelevant to Defendant's state of mind at the time he allegedly committed fraud in conveying Mother's property to himself.

Accordingly, the circuit court erred in allowing such evidence to be admitted at trial. Because the jury's award of punitive damages may have been based on the foregoing evidence, we must remand this case for a new trial on the punitive damages issue.

### B. *The Circuit Court's Other Evidentiary Rulings*

In view of our remand of this case for a new trial, we find it unnecessary to address Defendant's remaining arguments on appeal.

### CONCLUSION

Based on the foregoing discussion, we affirm the First Circuit Court's July 14, 1989 order granting partial summary judgment in Plaintiff's favor. We vacate that part of the June 9, 1992 Amended Judgment which awarded Plaintiff $95,000 in punitive damages and remand this case for a new trial on the punitive damages issue. In all other respects, we affirm the June 9, 1992 Amended Judgment. In view of our vacatur of part of the June 9, 1992 Amended Judgment, we also vacate the April 26, 1991 Order Denying Defendant's Motion for Reconsideration of [the February 4, 1991 Order Denying] Defendant's Motions for (A) Judgment Notwithstanding the Verdict, (B) Reconsideration of Order Denying Motion for Directed Verdict and (C) New Trial.