# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00479-COA

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF ELVA MAE HEMPHILL, DECEASED: GLORIA SWANK, ADMINISTRATRIX OF THE ESTATE OF ELVA MAE HEMPHILL, DECEASED | APPELLANT/CROSS-APPELLEE |

v.

| | |
|---|---|
| GERALDINE W. COVINGTON, LARRY D. FERRIS AND CATHERINE H. FERRIS | APPELLEES/CROSS-APPELLANTS |

| | |
|---|---|
| DATE OF JUDGMENT: | 03/17/2014 |
| TRIAL JUDGE: | HON. LAWRENCE PRIMEAUX |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | GLOVER A. RUSSELL JR. STEVEN ALFRED KOHNKE ERIN ELIZABETH HALFORD |
| ATTORNEYS FOR APPELLEES: | J. NILES MCNEEL J. MAX KILPATRICK |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEES' PARTIAL MOTION TO DISMISS FOR LACK OF STANDING; DENIED APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AFTER TRIAL ON THE MERITS, ENTERED JUDGMENT THAT CERTAIN FUNDS WERE THE PROPERTY OF APPELLANT AND CERTAIN OTHER FUNDS WERE THE PROPERTY OF APPELLEES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 02/09/2016 |

      **EN BANC.**

**WILSON, J., FOR THE COURT:**

**INTRODUCTION AND OVERVIEW**

¶1.     In January 2010, Elva Mae Hemphill passed away at the age of ninety-nine without a will. Her primary assets consisted of five certificates of deposit ("CDs") and a checking account. She had invested in CDs for years and intended to use joint ownership of CDs as an estate planning tool. As of April 6, 2007, she had named three of her sisters as joint owners of her various CDs and savings account. On that day, because her health had begun to decline, Elva Mae signed a power of attorney ("POA") appointing Geraldine Covington and Larry Ferris as her attorneys-in-fact. Geraldine is Elva Mae's niece, and Larry is married to another of Elva Mae's nieces, Cathy Ferris.

¶2.     When Elva Mae died less than three years later, her sisters were no longer joint owners of any of her assets. Rather, through a series of transactions, the CDs and savings account that she owned in April 2007 had been redeemed or liquidated, and the proceeds had been used to purchase new CDs or deposited into a checking account. Geraldine and the Ferrises were named as joint owners of the checking account and all of the CDs that Elva Mae owned at the time of her death. As such, these assets all passed to Geraldine and the Ferrises, rather than to Elva Mae's heirs-at-law.

¶3.     Another of Elva Mae's nieces, Gloria Swank, was appointed administrator of her estate and, on behalf of the estate, filed suit against Geraldine and the Ferrises. The estate asserted a variety of claims but generally alleged that Geraldine and the Ferrises were in a

confidential relationship with Elva Mae and exercised undue influence over her, and that Geraldine violated the terms of the POA by making herself and the Ferrises joint owners of Elva Mae's assets.

¶4. The chancery court dismissed much of the estate's case on the ground that Elva Mae's sisters were the proper plaintiffs with standing to sue for recovery of funds attributable to her CDs and savings account that they had jointly held with Elva Mae as of April 2007. The court found that the estate did have standing to sue with respect to Elva Mae's checking account and funds attributable to one CD. Thus, the case proceeded to trial as to those funds only. Following the trial, the chancellor found that Geraldine and the Ferrises had rebutted the presumption of undue influence that arises from a confidential relationship and so were entitled to retain funds attributable to Elva Mae's checking account. However, the chancellor also found that Geraldine violated the terms of the POA by making herself and the Ferrises joint owners of the one CD still at issue; thus, he awarded the estate the funds attributable to that CD. The estate appealed, and Geraldine and the Ferrises cross-appealed.

¶5. We conclude that there is substantial credible evidence in the record to support the chancellor's finding that Geraldine and the Ferrises rebutted the presumption of undue influence by clear and convincing evidence. Therefore, that finding is affirmed. We also affirm the chancellor's conclusion that Geraldine violated the clear terms of the POA to the extent she utilized it to make herself and the Ferrises joint owners of Elva Mae's funds. However, we reverse on the issue of standing. We hold that to the extent that Geraldine and

3

the Ferrises acquired joint ownership of Elva Mae's funds *because of a violation of the POA*, those funds must be returned to the estate. Our ruling on this issue permits the estate to recover certain funds in addition to those awarded by the chancellor. Below, after a discussion of the facts and procedural history of this case, we explain how our conclusions apply, and we remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶6. Elva Mae Hemphill was born on September 3, 1910. She never married or had children. She had five brothers and three sisters. As of April 2007, three sisters (Lillie Eatman, Gertie Bateman, and Nola White) and one brother (Clovis Hemphill) were still living. Elva Mae also had numerous nieces and nephews, including Nola White's daughter, Geraldine Covington; Clovis Hemphill's daughter, Cathy Ferris; and Lillie Eatman's daughter, Gloria Swank.

¶7. Elva Mae worked for many years at Flintkote in Meridian. She never made a lot of money, but she was frugal. She never owned a car or had a driver's license. She walked from her home to stores and banks in downtown Meridian and relied on a coworker for transportation to and from work. She saved much of what she earned, invested her savings in CDs, and actively shopped local banks for the best interest rates. Through her diligent saving and investing, by April 2007 she had amassed more than $636,000, held in a savings account and six CDs at three different banks.

¶8. As Elva Mae grew older, she relied increasingly on relatives for help. Geraldine

4

Covington, who lived in Louisville, Mississippi, visited regularly and wrote checks for Elva Mae at Elva Mae's direction. Cathy Ferris and her husband, Larry, also lived in Louisville, visited Elva Mae regularly, and brought her groceries.

¶9. In April 2007, Lillie Eatman and Gloria Swank visited Elva Mae and found her living in deplorable conditions. According to Gloria, Elva Mae's house was infested with rats and roaches, and there were feces on the floor and in her bed. There was a bucket in the bathroom for waste because the toilet was stopped up. There was also rotting food in the kitchen and little if any good food for Elva Mae to eat. Gloria testified that she found her aunt lying in bed in the fetal position. According to Gloria, her aunt was frail and emaciated, could not see or hear well, and said that she was "dying." When Gloria asked Geraldine and Cathy why Elva Mae was living in such conditions, they said that Elva Mae would not let them hire someone to help her.

¶10. Gloria called her brother John Eatman, who lived in Louisiana, and the two of them spent several days thoroughly cleaning Elva Mae's home. They also hired an exterminator. John described his aunt as very weak, unable to see, and very hard of hearing. John did not see Elva Mae again after April 2007.

¶11. At Gloria's insistence, she, Geraldine, Cathy, and Larry met and made a plan to ensure that Elva Mae had the assistance she needed to continue living in her own home.[1] Gloria said

---

[1] Another niece, Joann Bateman Wansley, claimed that she, rather than Gloria and Lillie, found Elva Mae living in the conditions described above. Joann claimed that she told Geraldine that she would apply for a guardianship if Geraldine did not hire full-time sitters

that someone should have power of attorney for Elva Mae, and she suggested Geraldine, since Geraldine was already writing checks for Elva Mae. However, Geraldine was not comfortable serving in that capacity on her own. Accordingly, Lillie Eatman suggested that Larry also have power of attorney, and Larry and Geraldine both agreed.

¶12. On April 6, 2007, Elva Mae signed a "Durable Power of Attorney for Financial Management." She signed the document at her house in the presence of Gloria, Lillie, Cathy, Larry, and two neighbors who served as witnesses. Someone either read the document aloud to Elva Mae or summarized its terms for her. According to testimony at trial, it had taken several days to persuade her that she should sign the document.

¶13. The POA expressly restricted Geraldine's and Larry's powers as follows:

> 10.  Attorney-in-fact Compensation
> My Attorney-in-fact will receive no compensation except for the reimbursement of all out of pocket expenses associated with the carrying out of my wishes.
>
> 11.  Co-owning of Assets and Mixing of Funds
> My Attorney-in-fact may not mix any funds owned by him or her in with my funds and all assets should remain separately owned if at all possible.
>
> 12.  Personal Gain from Managing My Affairs
> My Attorney-in-fact is not allowed to personally gain from any transaction he or she may complete on my behalf.

¶14. The same day, Elva Mae also signed an "Advance Health-Care Directive" form that designated Geraldine as her agent for making healthcare decisions. The document designated

---

for Elva Mae. Joann's testimony about these events and other matters was inconsistent with all other testimony and evidence.

6

Larry and Gloria as the first and second alternate agents.

¶15. The same two neighbors signed witness certificates for the POA and notarized declarations for the healthcare directive. The neighbors certified that, in their opinions, Elva Mae "had the capacity to understand the nature and effect of the [POA]." They also declared, under penalty of perjury, that Elva Mae "appear[ed] to be of sound mind."

¶16. As of the date Elva Mae executed the POA, she held the following joint account and CDs with rights of survivorship with her sisters:

| Account | Balance | Owner |
| --- | --- | --- |
| Citizens Bank CD ****2226 | $114, 432.00 | Elva Mae or Nola White |
| Citizens Bank CD ****2227 | $124,844.19 | Elva Mae or Lillie Eatman |
| Regions Bank CD ****0493 | $101,418.59 | Elva Mae or Nola White or Gertie Bateman |
| Trustmark CD ****30006 | $36,201.80 | Elva Mae or Lillie Eatman |
| Trustmark CD ****6022 | $121,755.69 | Elva Mae or Lillie Eatman |
| Trustmark CD ****6523 | $52,964.63 | Elva Mae or Lillie Eatman |
| Trustmark Savings ****4367 | $85,177.08 | Elva Mae or Lillie Eatman |

¶17. At trial, Gloria recalled an occasion prior to the execution of the POA when Elva Mae told her, "I've got [my money] like I want it." Gloria testified that she and her aunt never discussed finances again after Elva Mae signed the POA.

¶18. Elva Mae also had a checking account at Trustmark National Bank. Not long after Elva Mae signed the POA, Geraldine and Larry drove her to the bank to add them to the account as joint owners. Sandra Robinson, the Trustmark branch manager, came out to the

car to meet them because Elva Mae was in her housecoat. Robinson testified that either Geraldine or Cathy had called beforehand and said that Elva Mae wanted to designate additional owners of her checking account.

¶19. Geraldine and Larry sat on a bench outside the bank while Robinson and a notary talked with Elva Mae inside the car. Robinson testified that she and Elva Mae talked for about five minutes. Robinson testified that they discussed adding Geraldine and Larry to the account and that this would allow Geraldine and Larry to withdraw money from the account without Elva Mae's permission. Robinson also recalled discussing Elva Mae's love of reading and her failing eyesight. Robinson described Elva Mae as "very sharp." After talking to Elva Mae, Robinson was "satisfied" and "very comfortable" that Elva Mae was competent, that she knew what she was doing, and that her actions were voluntary. Elva Mae then executed a change of account authorization form, and Larry and Geraldine signed a signature card. Around this time, Elva Mae also signed an authorization form that gave Geraldine internet access to her Trustmark accounts. Through a series of online transactions in 2008, Geraldine transferred all funds from Elva Mae's savings account to her checking account to pay Elva Mae's bills and expenses, including wages for sitters.

¶20. In May 2007, Geraldine and the Ferrises hired Pamela Dempsey as a sitter for Elva Mae. Pamela prepared meals for Elva Mae and stayed with her twenty-four hours a day. Dempsey was off only every other weekend when Geraldine and her mother, Nola White, would stay with Elva Mae. She worked for Elva Mae for about one year.

8

¶21.   Around May 2008, Dempsey left, and Elsie Parney and Joyce Chisolm replaced her. Parney and Chisolm also stayed with Elva Mae around the clock but worked alternating weeks.  Parney is Elva Mae's second cousin and Cathy's niece.  Elva Mae interviewed both women before hiring them.  Both worked for Elva Mae until her death in January 2010.

¶22.   In October 2008, Elva Mae executed a deed conveying her home to Geraldine and Larry as joint tenants with rights of survivorship.  Elva Mae reserved a life estate in the property.  A local attorney, Alan Evans, prepared the deed and testified that he believed that Elva Mae was competent when she signed it.  Ownership of Elva Mae's home is not at issue in this case, but the deed was introduced into evidence at trial. Geraldine testified that she was not present when the deed was executed and had no involvement in the transaction other than being one of the grantees.  Consistent with her reservation of a life estate, Elva Mae continued to live in her home until she passed away.

¶23.   Between September 2008 and September 2009, a number of transactions occurred related to the CDs identified above in paragraph 16 as well as subsequent CDs purchased with the proceeds of those CDs.  We describe these transactions below.

### Citizens National Bank CDs

¶24.   In September 2008, Citizens CDs ****2226 and ****2227 matured.  Citizens CD ****2226 was in the name of Elva Mae or Nola White.  Citizens CD ****2227 was in the name of Elva Mae or Lillie Eatman.  Geraldine exercised the POA to use the proceeds of these two CDs to purchase two new Citizens CDs—numbers ****6258 and ****6259.  It

9

appears that Elva Mae was the sole owner of the new CDs.[2]

¶25. In September 2009, Citizens CDs ****6258 and ****6259 matured. Geraldine utilized the POA to surrender the CDs, and Citizens issued a check, payable to Elva Mae, in the amount of $241,363.21. Geraldine then endorsed that check by POA and reinvested $221,363.21 of the proceeds in a new First State Bank CD—number ****2649. Elva Mae, Geraldine, Larry, and Cathy were named as joint owners of the new CD. First State Bank issued a check for the remaining $20,000, payable to Elva Mae, which Geraldine endorsed by POA and deposited in the Trustmark checking account.

### *Trustmark CDs*

¶26. Melissa Calcote, a branch manager for Trustmark, testified that in October 2008 she spoke with Elva Mae twice by phone regarding Elva Mae's three Trustmark CDs, numbered ****3006, ****6022, and ****6523. Elva Mae made an appointment to come to the bank on October 16, 2008, to redeem the three CDs, which were then held in the name of Elva Mae or Lillie Eatman. On that day, one of Elva Mae's sitters drove her to the bank. Neither Geraldine, nor Larry, nor Cathy was present.

¶27. Calcote testified that Elva Mae "was very cognizant of the transaction that we were attempting to complete" and seemed capable of "handl[ing] her financial affairs." She remembered that Elva Mae asked whether a former Trustmark employee, Dixie Moon, was

---

[2] The testimony and a transaction flow chart admitted into evidence at trial seem to indicate that Geraldine and Larry were identified on the CDs only as Elva Mae's attorneys-in-fact, not as joint owners.

still alive. Her question indicated to Calcote that Elva Mae "certainly knew where she was and did not expect Ms. Moon to be part of the bank at that time, [and] knew that [Ms. Moon] was old enough to have retired and possibly passed away." Another Trustmark employee, Lisa James, was also present when Elva Mae redeemed the CDs. James had known Elva Mae for several years, describing her as a "long-time customer" and a "rate shopper" who called to ask about "CD specials." James said that on October 16, Elva Mae was "sharp as a tack," "talkative, [and] friendly just like she always was." Elva Mae deposited the funds from the three CDs—approximately $210,000—into her Trustmark checking account.

¶28. Thirteen days later, Geraldine used $220,942.12 from Elva Mae's checking account to purchase three new CDs at First State Bank, numbered ****2066, ****2067, and ****2068. The new CDs were in the names of Elva Mae or Geraldine or Larry or Cathy. The original maturity date for each CD was April 29, 2009; however, the CDs renewed automatically and were still in existence at the time of Elva Mae's death.

### Regions CD

¶29. Regions Bank CD ****0493 was in the name of Elva Mae or Nola White or Gertie Bateman. When the CD matured in May 2009, Geraldine exercised the POA to surrender the CD, and Regions issued a check for $101,418.59 payable to Elva Mae. Geraldine then endorsed the check by POA and used the entire proceeds toward the purchase of Regions CD ****3973, in the name of Elva Mae or Geraldine or Larry or Cathy.

11

¶30.    Thus, when Elva Mae died on January 22, 2010, her primary assets were as follows: her Trustmark checking account; First State Bank CDs ****2066, ****2067, ****2068, and ****2649; and Regions CD ****3973.  Geraldine and the Ferrises were joint owners with rights of survivorship of the checking account and all five CDs.  In April 2010, Geraldine surrendered Regions CD ****3973, and Regions issued two cashier's checks—one payable to Geraldine and one to Cathy or Larry—equally distributing the proceeds of $102,766.08. In April 2010, Geraldine also surrendered First State Bank CDs ****2066, ****2067, and ****2068, which then had a combined value of $227,323.72.  First State Bank issued two cashier's checks, each for half the proceeds, both payable to Geraldine or Cathy or Larry.[3] First State Bank CD ****2649 and the Trustmark checking account were frozen pursuant to an October 2010 order of the chancery court granting the estate's motion for a preliminary injunction.  The checking account then had a balance of approximately $30,000.

¶31.    In addition to addressing the circumstances of the above transactions, the evidence at trial focused on Elva Mae's mental acuity, health, and interactions with her family during the relevant time period.  Witnesses included Geraldine, Cathy, Larry, Gloria, another niece and three other nephews, Elva Mae's sitters, the three Trustmark employees, a friend of Elva Mae's who visited her regularly, Elva Mae's hospice chaplain,[4] and attorney Alan Evans.

---

[3] There was testimony that Geraldine and the Ferrises were maintaining the funds paid out by Regions and First State Bank pending resolution of this litigation.

[4] Geraldine testified that Elva Mae qualified for hospice care because of her advanced age and not because of any terminal illness.

12

¶32. Geraldine testified that she and her mother, Nola White, had always been close to Elva Mae. She testified that she had helped her aunt write checks and pay bills for several years prior to 2007. According to Geraldine, Elva Mae remained mentally sharp, independent, and knowledgeable about all of her various accounts until the time of her death. Geraldine testified that from 2007 to 2010, every financial transaction she executed on behalf of Elva Mae was in accordance with Elva Mae's specific instructions, including as to ownership. Geraldine acknowledged the above-quoted restrictions on her authority under the POA but testified that whether a transaction "was for my gain or profit . . . was not for [her] to say" because she simply "did what [Elva Mae] told [her] to do."

¶33. Cathy and Larry testified that they began helping Elva Mae fifteen to twenty years prior to her death by taking her shopping or to medical appointments, buying her groceries, and visiting her regularly. They did more to help as her physical health diminished gradually over time. Like Geraldine, they readily acknowledged a close and "confidential" relationship with Elva Mae but denied that they ever took advantage of her trust.

¶34. Gloria's testimony regarding the conditions of Elva Mae's home and the events of April 2007 is discussed above. In addition, Gloria testified that at Elva Mae's funeral, Geraldine made a comment that there were "going to be a lot of disappointed people" regarding Elva Mae's estate. Gloria also testified that at a subsequent family gathering, Larry said that Elva Mae had given all her money to the Salvation Army. According to Gloria, Larry told her and other relatives that he and Geraldine bought Elva Mae's house from her

13

because Elva Mae needed money. Larry denied making these statements.

¶35. Elva Mae's first sitter, Pamela Dempsey, testified that Elva Mae consistently was mentally alert during the period she stayed with her (May 2007 to May 2008) and that they had conversations on a number of topics, although they never discussed Elva Mae's money. Dempsey testified that Elva Mae was independent, strong-willed, and not easily influenced. Dempsey testified that Larry, Cathy, Geraldine, and Nola White were the only family members that visited regularly. Others called occasionally, including Elva Mae's sisters Lillie Eatman and Gertie Bateman and her nephew Cecil. Elva Mae had Dempsey take food to her brother Clovis once, but Clovis did not come to visit.

¶36. Elsie Parney—Cathy's niece, who worked for Elva Mae after Dempsey—testified that Elva Mae was independent, not easily influenced, and "smarter than she was." Parney recalled that she and Elva Mae had conversations about many different subjects during their time together, including the Great Depression, their relatives, and Elva Mae's finances. Parney testified that Elva Mae knew and could recall their family tree in detail. She said that Elva Mae knew about ancestors that she had never heard of and gave her accurate directions to ancestors' gravesites in cemeteries across three counties.

¶37. Parney testified that in 2009, she encouraged Elva Mae to make a will because she had so many nieces and nephews. However, Elva Mae told her that the people who "never set foot in [her] house" would not get her money. Elva Mae said, "I'm gon' fix it where nobody won't get it, except the ones I want to have it." According to Parney, Elva Mae said that she

14

wanted Geraldine, Cathy, and Larry to have her money "[b]ecause they were the ones that seen that she was taken care of and loved." Parney also testified that when one of Elva Mae's CDs matured, Elva Mae instructed Geraldine to use the proceeds to buy a new CD with her, Geraldine, Cathy, and Larry as joint owners. Elva Mae also told Geraldine "to try to get the highest interest rates that she could," "[b]ut they wasn't paying no interest rates hardly then," i.e., in 2009. Parney recalled Gloria, Lillie Eatman, Clovis Hemphill, and Gertie Bateman visiting only once each during the time she worked for Elva Mae.

¶38.   Joyce Chisolm, Elva Mae's other sitter at the time of her death, gave similar testimony. She said Elva Mae was "sharp as a tack"—"[s]he didn't forget anything and she didn't let you forget anything." She said that Elva Mae remained knowledgeable about a wide range of subjects. And, like others, she testified that Elva Mae was independent and not easily influenced. Chisolm also testified that she overheard conversations between Elva Mae and Geraldine regarding CDs, and her description of those conversations was similar to Parney's. According to Chisolm, Elva Mae said of her finances, "I got everything fixed like I want it." Chisolm testified that Elva Mae told her "that she was leaving everything to the people that helped her"—Geraldine, Cathy, and Larry. Chisolm recalled Gloria and Lillie visiting once per year, Joann visiting once, and other family members calling "occasionally."

¶39.   Elva Mae's nephew James Hemphill testified that he visited her every few months during the final years of her life and that she remained alert and talkative, could see a little bit, could hear reasonably well, and could still walk some with assistance. The last time

15

James saw her was about three months before her death. James testified that Elva Mae "knew what she was doing," and always recognized visitors. James is Clovis's son and Cathy's brother. Another nephew, Jimmy Hemphill, testified that he came to visit Elva Mae a couple of times a year, usually with James, and that in 2008 and 2009 she continued to recognize him by his voice, although her eyesight was failing.

¶40. Charles Stinnette, who was seventy-nine at the time of trial, testified that he had known Elva Mae for about thirty years. Stinnette was a handyman and occasionally did repairs or painting at Elva Mae's house. He testified that after doing some painting for Elva Mae in 2007 or 2008, he began visiting her at least every other Saturday, if not more often. He would bring her a cappuccino, which Elva Mae enjoyed, and they would talk about "old times back in the country" where they had grown up—gardening, making lye soap, butchering, and curing meats. Stinnette testified that Elva Mae remained "sharp" even at her advanced age and had an excellent memory. Later on, Stinnette tried to visit at least once a week and continued to do so until Elva Mae passed away. He testified that even in December 2009, she remained mentally sharp and that, from a mental standpoint, he "never noticed any difference [in her] the whole time." Elva Mae was asleep the last time he went to see her a few days before her death in January 2010. According to Stinnette, at some point Elva Mae told him that she had "left everything to Larry and Cathy and Geraldine."

¶41. Finally, Rev. Jesse Napp, the chaplain for Elva Mae's hospice provider, testified that he visited her once a month during the last eighteen months of her life. Much like other

16

witnesses, he testified that she was mentally aware, had a good memory, and could carry on conversations on a range of topics. Rev. Napp thought that she remained intelligent enough to make decisions on her own. He said that she was noticeably worse only on his last two visits, which occurred during the last three weeks of her life.

¶42. Elva Mae's estate was opened in July 2010, about six months after her death, and Gloria was appointed administrator. The estate eventually commenced this action by filing a complaint alleging that Geraldine and the Ferrises wrongfully obtained ownership of Elva Mae's assets by violating the POA or, alternatively, undue influence. The estate later moved for partial summary judgment as to the five CDs owned by Elva Mae at the time of her death, arguing that Geraldine had violated the terms of the POA by using her authority under the POA to make herself and the Ferrises joint owners of the CDs. Geraldine and the Ferrises opposed summary judgment and moved to dismiss most of the estate's claims with respect to the CDs for lack of standing. They argued that only Elva Mae's sisters—the joint owners of the CDs that Geraldine redeemed in 2008 and 2009—would have standing to assert those claims. The defendants acknowledged that the estate had standing with respect to one CD—Citizens CD ****2226—which Elva Mae had jointly owned with Nola White, who predeceased Elva Mae.[5]

¶43. Prior to trial, the chancellor granted the defendants' partial motion to dismiss and

---

[5] Nola White died in February 2008. Elva Mae's brother Clovis and her sister Gertie Bateman both passed away after Elva Mae's death but prior to trial. Her sister Lillie Eatman was still living at the time of trial but did not testify.

denied the estate's motion for partial summary judgment. The chancellor agreed with the defendants that the estate lacked standing with respect to most of Elva Mae's assets and thus dismissed all of the estate's claims except as they related to Citizens CD ****2226 and the Trustmark checking account. The chancellor denied the estate's motion for partial summary judgment because he concluded that there were genuine issues of material fact as to whether transactions related to Citizens CD ****2226 were void.

¶44. The case proceeded to trial in February 2014. Although the only issues to be tried concerned the estate's claims to funds not covered by the ruling on the motion to dismiss, evidence and testimony was received regarding all of Elva Mae's assets. Following trial, the chancellor issued a thorough opinion setting forth findings of fact and conclusions of law. In his opinion, the chancellor found (1) that there was a presumption of undue influence based on the defendants' confidential relationship with Elva Mae; (2) that the defendants successfully rebutted the presumption by clear and convincing evidence; and (3) that Geraldine had violated the POA by causing herself and the Ferrises to be joint owners of Citizens CD ****2226. Thus, in the final judgment, he awarded the estate the "funds on deposit attributable to" that CD but nothing else.[6] After a final judgment was entered, the estate appealed, and Geraldine and the Ferrises cross-appealed.

**ISSUES**

---

[6] The chancellor also found that there was no merit to several other common law claims raised in the estate's complaint. On appeal, the estate does not challenge that part of his ruling.

18

¶45. The issues that the parties raise on appeal and cross-appeal may be summarized as follows: The estate challenges the chancellor's (1) finding that the defendants rebutted the presumption of undue influence, (2) pretrial ruling on standing, and (3) denial of their motion for partial summary judgment based on alleged violations of the POA. Geraldine and the Ferrises defend most of the chancellor's rulings and findings but on cross-appeal challenge his determination that Geraldine misused the POA; therefore, they argue that the final judgment should be reversed only insofar as it awarded the estate funds attributable to Citizens CD ****2226. Thus, the defendants' argument on cross-appeal corresponds to the estate's third argument on appeal, although the arguments address rulings at different stages of the case. We address these issues below in the following order: standing, the effect of the restrictions that Elva Mae's POA placed on Geraldine's authority, and undue influence.

**STANDARD OF REVIEW**

¶46. "We employ a limited standard of review on appeals from chancery court." *Legacy Hall of Fame Inc. v. Transp. Trailer Serv. Inc.*, 139 So. 3d 105, 107 (¶9) (Miss. Ct. App. 2014) (citing *Miller v. Pannell*, 815 So. 2d 1117, 1119 (¶9) (Miss. 2002)). "We . . . will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Biglane v. Under The Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007) (quoting *Cummings v. Benderman*, 681 So. 2d 97, 100 (Miss. 1996)) (quotation marks and brackets omitted). This deferential standard

19

of review applies to the chancellor's ultimate finding that the defendants successfully rebutted the presumption of undue influence and to any subsidiary findings. However, in evaluating the sufficiency of the evidence, we do "bear in mind" that at trial the defendants "bore a clear and convincing evidence burden." *See Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987).

¶47. "We use a de novo standard when analyzing questions of law." *Biglane*, 949 So. 2d at 14 (¶17). And because standing is a jurisdictional issue, our standard of review on that issue is de novo. *Hotboxxx LLC v. City of Gulfport*, 154 So. 3d 21, 27 (¶19) (Miss. 2015).

## DISCUSSION

### I.  Standing

¶48. As discussed above, the chancellor held that the proper parties with standing to challenge the transactions related to Elva Mae's CDs after the date of execution of the POA were the joint tenants on those accounts who survived her death. The chancellor reasoned that the parties harmed by any misuse of the POA were Elva Mae's surviving sisters because, but for the transactions that Geraldine executed under the authority of the POA, the sisters—not Elva Mae's estate—would have owned the CDs upon Elva Mae's death. In addressing this issue, the chancellor was persuaded by *Tewksbury v. Tewksbury*, 957 N.E.2d 362 (Ohio Ct. App. 2011). In *Tewksbury*, less than three weeks prior to his death, "an elderly, infirm stroke-victim" executed a POA that designated one of his sons as his attorney-in-fact. *Id.* at 363-64 (¶¶3, 5). The son promptly "liquidated several [CDs] that belonged to

his father and placed the proceeds in his own account." *Id.* at 364 (¶7). The court concluded that the father's estate lacked standing to recover those funds because, prior to their liquidation, the CDs had been payable to another son—the defendant's brother—upon the father's death. *Id.* at 365 (¶14). Thus, the court reasoned that "even if the transfers [were] voided, the assets would not return to the estate, but rather to [the defendant's brother]." *Id.* at (¶15).

¶49.    Reviewing the issue de novo, we cannot agree that Elva Mae's surviving sisters were the proper parties to challenge transactions executed in violation of the terms of the POA. A POA "is nothing more than one form of a principal-agency relationship." *Clark v. Ritchey*, 759 So. 2d 516, 518 (¶7) (Miss. Ct. App. 2000) (citing *McKinney v. King*, 498 So. 2d 387, 388-89 (Miss. 1986)); *see also King Metal Bldgs. Inc. v. Renasant Ins.*, 159 So. 3d 567, 570 n.8 (Miss. Ct. App. 2014) (holding "a power of attorney allows a principal to convey to an agent the authority to act on its behalf in identified matters"). As in any other principal-agent relationship, by virtue of the POA the attorney-in-fact owes certain duties to the principal. *See* Restatement (Third) of Agency § 8.07 (2006) ("An agent has a duty to act in accordance with the express and implied terms of any contract between the agent and the principal."). However, "[a]n agent is not liable to third parties for breaches of the duties that he owes to his principal . . . ." *Lee Hawkins Realty Inc. v. Moss*, 724 So. 2d 1116, 1118 (¶10) (Miss. Ct. App. 1998); *accord* Restatement (Third) of Agency § 7.02 (2006).

¶50.    For this reason, we conclude that Elva Mae's surviving sisters would not have been

the proper parties to challenge transactions executed in violation of Elva Mae's POA. In essence, the defendants argue that the sisters should have sued as third-party beneficiaries of the POA; however, there is no basis for treating the sisters as third-party beneficiaries of that instrument.[7] As ordinary nonparties to the POA, they would have had no claim against Geraldine for losses allegedly resulting from Geraldine's breach of duties or obligations under the POA. Geraldine owed those duties and obligations to Elva Mae, not her sisters.

¶51. Moreover, although it is not essential to our conclusion as to standing, we note that the specific transactions that harmed Elva Mae's sisters were not the same transactions that violated the terms of the POA. As to the Citizens CDs (*see supra* ¶¶24-25), Geraldine surrendered two CDs that Elva Mae jointly owned with Nola White and Lillie Eatman, respectively. She then reinvested the proceeds in two new CDs that were owned solely by Elva Mae. The former transaction is the one that negatively impacted the sisters, but neither transaction violated the terms of the POA because neither gave Geraldine ownership of the funds.[8] In addition, Elva Mae personally cashed out the Trustmark CDs that she had jointly owned with her sisters and deposited the proceeds in her checking account. *See supra* ¶¶26-28. That transaction—not Geraldine's subsequent investment of the proceeds—harmed the sisters, but it had nothing to do with the POA. Finally, with respect to the Regions CD that

---

[7] *See generally Burns v. Washington Savings*, 251 Miss. 789, 796, 171 So. 2d 322, 325 (1965).

[8] One year later, Geraldine did reinvest these funds in new CDs that she jointly owned. *See supra* ¶25.

Elva Mae jointly owned with Nola White and Gertie Bateman (*see supra* ¶29), Geraldine's surrender of the CD did not violate the POA because the proceeds were payable solely to Elva Mae. The action that violated the POA was Geraldine's subsequent endorsement of the check, by POA, to purchase a new CD that named her and the Ferrises as joint owners.

¶52. Rather than analyzing these events as distinct transactions, the chancellor viewed them as a series of inextricably interrelated exchanges through which Geraldine and the Ferrises ultimately replaced Elva Mae's sisters as owners of the CDs. That is a reasonable way to look at the case, but when each transaction is considered on its own terms, it becomes clear that the sisters were not harmed by violations of the POA. Indeed, in one case, Elva Mae *personally* surrendered CDs that she had jointly owned with her sisters. Thus, beyond the general rule that third parties lack standing to sue for an agent's violation of her duties to her principal, in this particular case the third parties—the sisters—simply were not harmed by the alleged violations.

¶53. Having determined that Elva Mae's surviving sisters would not have been proper plaintiffs to challenge transactions executed in violation of the POA, we also agree with the estate that it is the proper plaintiff and does have standing. The chancellor concluded that Elva Mae "had no action to recover funds" because "funds were never transferred out of [her] name," and so "she remained an owner [of all] of the accounts" during her lifetime. We conclude, however, that this is too narrow a view of Elva Mae's rights under the terms of her POA. As set out above, the POA prohibited Elva Mae's attorneys-in-fact from profiting

23

from their role, commingling their funds with hers, or taking ownership of her assets. These protections were for the benefit of Elva Mae alone. During her lifetime, she had a right to enforce them and to challenge any violation of them regardless of whether she was immediately deprived of ownership of any funds. Thus, during her lifetime, she could have commenced an action to set aside Geraldine's and the Ferrises' joint ownership of the CDs. Therefore, upon her death, her estate became the proper party to commence such an action. *See* Miss. Code Ann. § 91-7-233 (Rev. 2013) ("[A]dministrators . . . may commence and prosecute any personal action whatever, at law or in equity, which the . . . intestate might have commenced and prosecuted."); *In re Estate of Beckley*, 961 So. 2d 707, 710-11 (¶¶3-5) (Miss. 2007).[9] If successful, such a claim would void Geraldine's and the Ferrises' ownership of the funds, which would then be the property of Elva Mae's estate.

¶54. Accordingly, the estate had standing to challenge actions taken by Geraldine that violated the terms of the POA. We now consider whether Geraldine violated the POA.

## II. Restrictions on Geraldine's Authority Under the POA

¶55. As discussed above, following a trial on the merits, the chancellor found that

---

[9] In *Beckley*, the Supreme Court held that an estate was the proper plaintiff in an action to recover funds that the decedent's attorney-in-fact obtained by surrendering a CD that the decedent jointly owned with his brother. *See id.* The chancellor concluded that *Beckley* was distinguishable because the attorney-in-fact in that case completely divested the decedent of ownership of the funds and the decedent filed suit prior to his death so that the estate was merely substituted as a party in a pending case. Having distinguished *Beckley*, the chancellor found *Tewksbury*, *supra*, persuasive. We agree that *Beckley* is not on all fours but, for the reasons explained in the text, do not find *Tewksbury*'s limited discussion of the standing issue persuasive.

24

Geraldine had violated the POA with respect to the one CD not covered by his prior ruling on the defendants' motion to dismiss—Citizens Bank CD ****2226. Therefore, he ruled that funds attributable to that particular CD were the rightful property of the estate.[10] The chancellor reasoned that paragraphs 10, 11, and 12 of the POA, which we quote in full above, "are clear and unambiguous" and that Geraldine had violated them by making herself and the Ferrises joint owners of Elva Mae's funds. In his opinion, the chancellor acknowledged Geraldine's testimony that Elva Mae specifically instructed her to put her name and the Ferrises' names on the CDs, and he even stated that he was "convinced that Geraldine . . . truly believed that she was carrying out Elva Mae's wishes." However, he concluded that such "parol evidence" could not vary the plain "language of the POA."

¶56. We agree with the chancellor's ruling on this issue. In clear terms, the POA provided that Geraldine and Larry were "not allowed to personally gain from any transaction" that either of them executed on behalf of Elva Mae; that "all assets should remain separately owned if at all possible"; and that Geraldine and Larry were not to commingle their funds with Elva Mae's or receive any "compensation" for serving as attorneys-in-fact. By making herself and the Ferrises joint owners of Elva Mae's CDs, Geraldine clearly violated these

---

[10] As described above (*see supra* ¶24), this CD was surrendered in 2008, and its proceeds were invested in a new CD that was surrendered in 2009. The combined proceeds of that CD and another CD were then in part invested in a new CD, which still existed at the time of trial, and in part deposited in Elva Mae's checking account. Thus, identification of the funds "attributable to" the original CD presumably would have required some additional calculations by the parties or the chancery court.

provisions of the POA, and the defendants do not argue otherwise. Rather, they argue that Elva Mae's alleged oral instructions to Geraldine effectively "waive[d] or change[d]" these provisions. We agree with the chancellor that parol evidence of alleged oral instructions cannot be used to vary the clear and unambiguous language of the POA.

¶57. It is true that under Mississippi law a POA that grants the attorney-in-fact "full power to handle the principal's affairs or deal with the principal's property" is sufficient to give the attorney-in-fact "the power and authority to make gifts in any amount . . . to *any* individuals." Miss. Code Ann. § 87-3-7(2) (Rev. 2011) (emphasis added). The defendants also emphasize that we have held that in some circumstances extrinsic or parol evidence regarding the principal's wishes may be sufficient to uphold an attorney-in-fact's gift to himself from his principal's property. *See In re Estate of Hall*, 32 So. 3d 506, 511, 518-20 (¶¶11, 41-51) (Miss. Ct. App. 2009); *but see id.* at 520-22 (¶¶53-61) (King, C.J., dissenting) (reaching the opposite conclusion). However, *Hall* is distinguishable because the POA in that case did not expressly prohibit such self-dealing. It was merely silent on the issue.

¶58. The POA's express prohibition on self-dealing makes a difference. We agree with those courts that have held that when an attorney-in-fact is prohibited from giving himself gifts from the principal's property, "extrinsic evidence of the principal's intent to allow such gifts is not admissible." *Kunewa v. Joshua*, 924 P.2d 559, 565 (Haw. Ct. App. 1996); *accord, e.g.*, *Estate of Huston*, 51 Cal. App. 4th 1721, 1726-27 (Cal. Ct. App. 1997); *In re Estate of Herbert*, 152 S.W.3d 340, 346, 351-54 (Mo. Ct. App. 2004); *Crosby v. Luehrs*, 669

N.W.2d 635, 644 (Neb. 2003); *Fender v. Fender*, 329 S.E.2d 430, 431 (S.C. 1985); *Studt v. Black Hills Fed. Credit Union*, 864 N.W.2d 513, 515-17 (¶¶10-14) (S.D. 2015); *Bienash v. Moller*, 721 N.W.2d 431, 435-37 (¶¶18-27) (S.D. 2006); *Praefke v. Am. Enter. Life Ins.*, 655 N.W.2d 456, 460-62 (Wis. Ct. App. 2002). These courts have recognized that "durable gifting powers" carry an "inherent potential for fraud and abuse." *Praefke*, 655 N.W.2d at 461. This is not only because of the broad authority such powers confer but also because in many cases the power is granted precisely because the principal is vulnerable or dependent on others. *Id.*; *Herbert*, 152 S.W.3d at 353. If limitations on these powers are not enforced, "an attorney in fact, if so inclined, would be allowed to make an unauthorized gift, based upon claimed oral authorization of the principal, and the only person who could refute the claim would be dead." *Herbert*, 152 S.W.3d at 353. Given these concerns, these courts have held that a principal's alleged oral statements to her attorney-in-fact cannot modify or "negate [her] formal expression of her intent as embodied in the power of attorney agreement." *Praefke*, 655 N.W.2d at 461.[11] The "justification for such a flat rule" against parol or extrinsic evidence "is made even more apparent when one considers the ease with which such a rule can be accommodated by principals and their draftsmen." *Kunewa*, 924 P.2d at 565 (quoting *Estate of Casey v. Comm'r of Internal Revenue*, 948 F.2d 895, 898 (4th Cir. 1991)); *accord Praefke*, 655 N.W.2d at 461. That is, nothing prohibits a principal from

---

[11] *See also Huston*, 51 Cal. App. 4th at 1727 (holding that a principal cannot "ratify" a gift that violated the express terms of a POA without executing a written ratification or written modification of the attorney-in-fact's authority under the POA).

27

expressly authorizing such gifts in writing. We hold only that the attorney-in-fact cannot rely on an alleged oral authorization where the POA itself expressly prohibits such gifts.

¶59.    We acknowledge that the cases cited above generally involved a statutory or common law rule that an attorney-in-fact may not give himself the principal's property in the absence of express written authorization. *Kunewa*, 924 P.2d at 565 (common law). That is, the result in those cases did not turn on an express prohibition in the POA, although such provisions were present in at least some cases. *See Herbert*, 152 S.W.3d at 351; *Huston*, 51 Cal. App. 4th at 1726. However, their reasoning applies with at least equal force when, as in this case, the prohibition is in the POA itself rather than in background law alone. First, the effect of the background rule in the above-cited cases was simply that the POA was interpreted as prohibiting the gift—just as the POA in this case. Second, if we were to allow an attorney-in-fact to use parol or extrinsic evidence to negate an express prohibition contained in the terms of the POA, then even a POA drawn specifically to protect against self-dealing would give the principal very little additional protection against that abuse.

¶60.    Thus, we agree with the chancellor that Elva Mae's alleged oral statements to Geraldine cannot negate the express terms of her POA. Elva Mae's POA clearly and unambiguously prohibited Geraldine from recognizing any personal gain on any transaction executed under authority of the POA. Accordingly, any such transaction is void ab initio as between the estate and the defendants. *See In re Estate of Hardy*, 910 So. 2d 1052, 1056 (¶17) (Miss. 2005).

¶61. In the previous section, we held that the estate has standing to challenge all transactions executed in violation of the POA. Our holding in this section applies to the transactions challenged by the estate as follows:

¶62. **"Citizens CDs"** (*supra* ¶¶24-25)—In September 2009, Geraldine utilized the POA to surrender Citizens CDs ****6258 and ****6259, and Citizens issued a check payable to Elva Mae in the amount of $241,363.21. Geraldine endorsed that check by POA and reinvested $221,363.21 of the proceeds in a new First State Bank CD—number ****2649. Elva Mae, Geraldine, Larry, and Cathy were named as joint owners of the new CD. First State Bank issued a check for the remaining $20,000, payable to Elva Mae, which Geraldine endorsed by POA and deposited in the Trustmark checking account. By this point, Geraldine and the Ferrises were joint owners of the checking account. Geraldine violated the POA by making herself and the Ferrises joint owners of these funds. Accordingly, the estate is entitled to recover First State Bank CD ****2649. The estate is also entitled to recover any remaining funds attributable to the $20,000 that Geraldine deposited into the checking account.

¶63. **"Trustmark CDs"** (*supra* ¶¶26-28)—In October 2008, Elva Mae personally surrendered three Trustmark CDs and deposited the proceeds in her checking account. Geraldine did not participate in this transaction. Two weeks later, Geraldine did utilize the POA to reinvest the proceeds in three new First State Bank CDs—numbered ****2066, ****2067, and ****2068—and she designated herself, the Ferrises, and Elva Mae as joint owners of the new CDs. However, by this time, Elva Mae had made Geraldine and the

29

Ferrises joint owners of the checking account. Thus, Geraldine did not "personally gain" from purchasing the new CDs. She merely moved funds from a checking account that she jointly owned to a CD that she jointly owned. She was already a joint owner of both the checking account and the funds as a result of transactions that Elva Mae executed *personally*. Accordingly, funds attributable to First State Bank CDs ****2066, ****2067, or ****2068 are *not* tainted by any violation of the POA.

¶64. ***"Regions CD"*** (*supra* ¶29)—In May 2009, Geraldine, by POA, surrendered a CD of Elva Mae's at Regions Bank and reinvested the proceeds in Regions CD ***3973. The new CD was in the name of Elva Mae or Geraldine or the Ferrises. Because Geraldine personally benefitted from this transaction, it violated the POA, and the estate is entitled to recover funds attributable to Regions CD ***3973.

### III. Undue Influence

¶65. Finally, we address the estate's argument that the chancellor erred in finding that the defendants had successfully rebutted the presumption of undue influence. In the previous section, we held that the estate was entitled to recover certain funds because of transactions executed in violation of the POA. Accordingly, our discussion in this section applies to and focuses on funds not affected by any violation of the POA—namely, funds in the Trustmark checking account and First State Bank CDs ****2066, ****2067, and ****2068. Because we find that the chancellor's ruling on this issue is supported by substantial evidence, we affirm in relevant part.

30

¶66. "Where a confidential relationship exists, there is a presumption of undue influence concerning an inter vivos gift. Such gifts are presumed invalid." *In re Estate of Reid*, 825 So. 2d 1, 3 (¶13) (Miss. 2002). The defendants concede the existence of a confidential relationship, and the chancellor found that the evidence clearly supported that conclusion. We agree. *See generally id.* (identifying factors relevant to the question whether a confidential relationship exists).

¶67. "Once the existence of a confidential relationship is established, the burden shifts to the beneficiary to rebut the presumption of undue influence by clear and convincing evidence." *In re Smith*, 170 So. 3d 530, 537 (¶17) (Miss. Ct. App. 2014). To overcome the presumption of undue influence, the beneficiary must show: (1) that he or she "acted in good faith, (2) that the grantor had full knowledge and deliberation of [her] actions and the consequences of those actions, and (3) that the grantor exhibited independent consent and action." *Id.* (citing *Murray v. Laird*, 446 So. 2d 575, 578 (Miss. 1984)).

¶68. With respect to the first prong of this test—whether the gift was accepted in "good faith"—we consider five factors: (1) who initiated the transaction; (2) where and in whose presence the transaction was executed; (3) any consideration or fees paid; (4) who paid them; and (5) the secrecy or openness of the transaction. *Id.*

¶69. The chancellor's opinion expressly considered these factors and found that the defendants acted in good faith. The chancellor noted that Elva Mae added Geraldine and Larry to her bank account outside of their presence after a discussion with two Trustmark

31

employees. The branch manager, Sandra Robinson, believed that Elva Mae was mentally alert and that her actions were knowing and voluntary. Similarly, Elva Mae surrendered her Trustmark CDs personally after a discussion with two Trustmark employees, both of whom thought that she was mentally sharp and understood what she was doing. Moreover, Elva Mae had her sitter take her to the bank to complete this transaction. Neither Geraldine nor the Ferrises were present. As the chancellor put it, "Elva Mae [was] repeatedly described . . . as being close-lipped about her money and business affairs . . . . If there were any secrecy in these matters, it was Elva Mae who imposed it, not others who were conniving under a cloak of secrecy to betray her." In addition, although Gloria and other relatives testified that they were unaware of these transactions, there was no evidence that any of them ever asked Geraldine or the Ferrises about the state of Elva Mae's finances during her lifetime. Finally, although they had the opportunity, there was no evidence that Geraldine or the Ferrises ever used any of Elva Mae's money for their own benefit during her lifetime. In short, there is substantial evidence to support the chancellor's finding of good faith.

¶70. With respect to the second prong of the three-part test—the grantor's "full knowledge and deliberation" of her actions and their "consequences"—we consider the following:

> (a) the grantor's awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent the grantor is on him and how susceptible to his influence.

32

*Smith*, 170 So. 3d at 538 (¶24) (quoting *Mullins*, 515 So. 2d at 1195) (alterations omitted).

¶71.    The chancellor's finding that the defendants satisfied this prong is also supported by substantial evidence.  In addition to the testimony of Geraldine, Larry, and Cathy, three Trustmark employees testified that they believed that Elva Mae was competent to understand the transactions that she executed at the bank and that her actions were voluntary.  These transactions certainly gave her an "awareness" of the amount of funds in the jointly owned checking account.  Elva Mae's sitters also testified that she remained aware of her financial affairs and the status of her CDs, that she wanted to leave her money to Geraldine, Larry, and Cathy, and that she did *not* want her other relatives to inherit from her.  Charles Stinnette likewise testified that Elva Mae intended to leave everything she owned to the defendants.  Moreover, evidence of Elva Mae's significant experience investing in CDs indicates that she understood and appreciated the significance and consequences of joint ownership.[12]

¶72.    Finally, the chancellor noted that except for testimony that Elva Mae was not well physically when Gloria arrived at her home in April 2007, there was no competent evidence to call into question her understanding of her finances or her ability to make decisions.  Even

---

[12] "[W]here a joint tenancy account in a bank is made payable to either depositor or survivor, the account passes to the survivor upon the death of a joint tenant." *In re Estate of Huddleston*, 755 So. 2d 435, 439 (¶10) (Miss. Ct. App. 1999) (quoting *Strange v. Strange*, 548 So. 2d 1323, 1327 (Miss. 1989) (internal quotations omitted)).  "Without doubt, our law allows competent adults to use such will substitutes with effect and thereby avoid probate." *Id.* (quoting *Cooper v. Crabb*, 587 So. 2d 236, 239 (Miss. 1991)).

in April 2007, the chancellor emphasized, Elva Mae retained sufficient mental acuity that the neighbors who witnessed her sign the POA opined that she "had the capacity to understand the nature and effect of the [POA] . . . and signed it freely and voluntarily." Accordingly, based on this and other evidence discussed above, we conclude that there is ample support in the record for the chancellor's finding of "full knowledge and deliberation."

¶73.    With respect to the third requirement for overcoming the presumption of undue influence—the grantor's "independent consent and action"—"[t]he Mississippi Supreme Court has held that the best way to show independent consent and action is to provide 'advice of (a) competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interests." *Dean v. Kavanaugh*, 920 So. 2d 528, 537 (¶46) (Miss. Ct. App. 2006) (quoting *Madden v. Rhodes*, 626 So. 2d 608, 622 (Miss. 1993)).  However, the Supreme Court has made clear that "'[i]ndependent advice is but one way independent consent and action may be shown."'  *In re Estate of Holmes*, 961 So. 2d 674, 680 (¶18) (Miss. 2007) (quoting *Mullins*, 515 So. 2d at 1193).  Whether independent consent and action has been proven is a case-specific inquiry.  *See Madden*, 626 So. 2d at 620, 622.

¶74.    In this case, the chancellor found that

> Elva Mae did not need expert guidance and financial advice to manage her own affairs.  She had done so independently through her entire adult life, accumulating over half a million dollars from a modest salary, and she was probably more savvy about financial matters than most young business administration graduates who have no real experience.  The bank officials, who had years of experience in dealing with transactions such as those in this case, had no hesitancy in deciding that Elva Mae was exercising independent consent and action.

34

¶75. The chancellor also found credible the testimony of Elva Mae's sitters "who were with her daily in the last 18 months of her life." In addition, we note that only one week before she surrendered her Trustmark CDs, Elva Mae also executed a warranty deed conveying her home to Geraldine and the Ferrises (while reserving a life estate). The attorney who prepared the deed testified that he met with her and believed that she was competent and understood the nature and consequences of the transaction. In summary, substantial evidence supports the chancellor's finding of independent consent and action.

¶76. The estate, of course, disagrees with the chancellor's conclusion that the defendants rebutted the presumption of undue influence by clear and convincing evidence. The estate attempts to recharacterize as an issue of law what is really a dispute about the underlying facts and the credibility of witnesses. Specifically, the estate contends that the chancellor's decision violates the principle "that the testimony of the [grantees] or interested parties is not sufficient to rebut the presumption of undue influence." *Holmes*, 961 So. 2d at 681 (¶19). The estate argues that Sandra Robinson, the Trustmark branch manager, was an interested party because she "was acting on Geraldine's behalf and at Geraldine's instruction." We do not agree. Although Robinson offered the only direct testimony about the change of ownership of the Trustmark checking account, her limited interaction with the defendants—she testified that she spoke briefly to one of them on the phone sometime before meeting with Elva Mae—is insufficient to make her an "interested party." Robinson was not the defendants' agent and received no personal benefit as a result of the transaction. She was

simply an employee of the bank and acted on behalf of Trustmark, not the defendants. Thus, the estate's argument is, at best, a garden variety challenge to Robinson's credibility, not a basis for reversal on appeal.[13]

¶77.   In summary, we affirm the chancellor's determination that the defendants rebutted the presumption of undue influence by clear and convincing evidence. Therefore, the 2007 transaction by which the defendants became joint owners of the Trustmark checking account is not void for undue influence or any other reason. For the reasons explained above, the estate *is* entitled to recover funds in the checking account that are attributable to Geraldine's September 2009 deposit of $20,000. Those funds were payable solely to Elva Mae; accordingly, Geraldine's use of the POA to deposit the funds in a jointly owned account violated the terms of the POA. *See supra* ¶62. Other than these specific funds, the defendants are entitled to all funds in the Trustmark checking account.

¶78.   In addition, the defendants are entitled to retain all funds attributable to First State Bank CDs ****2066, ****2067, and ****2068. As explained above, Geraldine did not violate the POA by investing those funds in CDs that she jointly owned with Elva Mae (*see supra* ¶¶63), and the defendants rebutted any claim of undue influence.

## CONCLUSION

---

[13] *See, e.g.*, *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013) ("This Court gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and 'personally evaluate the witnesses' testimony and the parties' behavior.'"); *Powell v. Ayars*, 792 So. 2d 240, 243 (¶6) (Miss. 2001) ("It is for the chancellor to determine the credibility and weight of evidence.").

¶79. For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings. The estate is entitled to recover First State Bank CD ****2649, funds attributable to Regions CD ***3973, and funds attributable to the September 2009 deposit of $20,000 in the Trustmark checking account. The defendants shall retain ownership of all additional funds in the Trustmark checking account and all funds attributable to First State Bank CDs ****2066, ****2067, and ****2068. The case is remanded for further proceedings consistent with this opinion.

¶80. **THE JUDGMENT OF THE CHANCERY COURT OF LAUDERDALE COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT/CROSS-APPELLEE AND ONE-HALF TO THE APPELLEES/CROSS-APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE AND CARLTON, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. FAIR AND GREENLEE, JJ., NOT PARTICIPATING.**